## SUPERIOR BATH HOUSE CO. *v.* McCARROLL, COMMISSIONER OF REVENUES OF ARKANSAS.

No. 180.   Submitted December 18, 1940.—Decided February 3, 1941.

*Mr. Terrell Marshall* submitted for appellant.

*Messrs. Frank Pace, Jr.* and *Lester M. Ponder* submitted for appellee.

MR. JUSTICE BLACK delivered the opinion of the Court.

By a 1929 Act, Arkansas imposed a tax of 2% on the net income of domestic corporations "with respect to

carrying on or doing business" in the state.[1]  Appellant, a corporation organized under Arkansas law, leases from the United States and operates for profit a bath house on the federal reservation at Hot Springs.  Whether appellant is subject to the state tax depends on the interpretation of the language of a provision of a Congressional Act of 1891 and the corresponding provision of an Arkansas Act of 1903.  The Congressional Act reads: "The consent of the United States is hereby given for the taxation, under the authority of the laws of the State of Arkansas applicable to the equal taxation of personal property in that State, as personal property of all structures and other property in private ownership on the Hot Springs Reservation."[2]  The 1903 Arkansas act ceded to the United States exclusive jurisdiction over the business area of the reservation, reserving only the right to tax accorded by the 1891 Act and the right to serve criminal and civil process.[3]  The Supreme Court of Arkansas held appellant liable for the tax,[4] and the case is here on appeal as authorized by 28 U. S. C., § 344.

---

[1] Ark. Acts (1929) No. 118.

[2] 26 Stat. 844.  The quoted language was § 5 of a general Act dealing with the reservation.  The section was added as a Senate amendment to a House bill, and the only relevant legislative reference to it is a statement by the House conferees that "Section 5 provides for local taxation of the bath houses, so far as the consent of the United States is concerned."  22 Cong. Rec. 3513.  Arkansas, in ceding exclusive jurisdiction over part of the reservation, expressly referred to the taxing powers conferred by the 1891 Act (Ark. Acts (1903) No. 30), and later federal Acts extending exclusive federal jurisdiction over larger portions of the reservation have provided that such extension of jurisdiction shall "not be so construed as to interfere with the right to tax all structures and other property. . . ."  (E. g., 33 Stat. 187.)

[3] Ark. Acts (1903) No. 30.

[4] 200 Ark. 233; 139 S. W. 2d 378.  In addition to urging that Arkansas had no power to levy this tax, appellant had urged that it was denied equal protection by virtue of a 1931 statute exempting

Arkansas does not contend, nor did the Supreme Court of that state hold, that appellant was liable for the state income tax under the general power of the state to tax corporations created pursuant to Arkansas law. On the contrary Arkansas admits that under the reciprocal state and federal acts the United States possesses complete sovereign power over the Hot Springs Reservation, subject to the right of the State of Arkansas to tax in accordance with the 1891 Act and subject to its right to execute within the reservation its civil and criminal process. The state does not claim a right of any kind to tax any corporation or individual doing business on the reservation unless the tax comes within the scope of its agreement with the government, effectuated by the 1891 and 1903 federal and state legislation. Since the state has taken this view, and since it is our opinion that the tax can be sustained on this basis, it is unnecessary for us to determine whether any other basis might conceivably exist.

While not controlling here, it has been the consistent conviction of the Arkansas court that the federal legislation conferred broad powers of taxation upon the state. In *Ex parte Gaines,* 56 Ark. 227; 19 S. W. 602, decided one year after the original 1891 Act, the court held that a leasehold interest on the reservation was subject to state taxation. In *Buckstaff Bath House Co.* v. *McKinley,* 198 Ark. 91; 127 S. W. 2d 802,[5] the court upheld the state unemployment compensation tax, saying of the 1891 Act: "The Congress seemingly intended (and this construction is strengthened by the *Gaines* case) to permit

---

from the tax those domestic corporations organized for the purpose of doing business outside the state. (Ark. Acts (1931) No. 220.) This latter contention is wholly without merit, and will not be discussed.

[5] Affirmed on other grounds, 308 U. S. 358.

the State to exercise its sovereignty within the Reservation with respect to the conduct of business, commerce, and the professions, subject only to the interest retained by the Government and the right to enforce restrictions under the federal laws . . ."

Appellant, however, reads the Act more narrowly than does the Arkansas court, and contends that the only taxes Arkansas can levy are ad valorem taxes imposed directly on tangible property. But the words tangible and ad valorem appear nowhere in the Act, nor do any synonymous words there appear. And in our opinion to construe the Act as though such words had been used would do violence to the intent of Congress. The language of Congress was peculiarly adapted to the broadening of the state's taxing power—not to its restriction. Thus, though under Arkansas law structures attached to land were considered a part of the realty, taxable or non-taxable with the land,[6] Congress provided that privately owned structures on the tax exempt land of the reservation should be taxed "as personal property." Not only was this done, but also all "other property in private ownership" was expressly made subject to state taxation. By these provisions Congress manifested its purpose that no type of privately owned property should escape the state's taxing power merely because it was owned or used on the reservation.

And appellant's insistence that these provisions permit only ad valorem taxation loses sight of the fact that the word property is by no means limited, in all its variations,

---

[6] At the time of the 1891 Act, the Arkansas law provided that "The term 'real property and lands' . . . shall be held to mean . . . all buildings, structures and improvements, and other fixtures of whatever kind. . . ." Ark. Stats. (Mansfield, 1884) § 5585. See Union Compress Co. v. State, 64 Ark. 136. Such is still the Arkansas law. Ark. Dig. Stats. (Pope, 1937) § 13358.

to actual tangible physical things.[7]   Its meaning must be determined from its context as illumined by the subject treated and the objectives sought.   It is true that Arkansas had no corporate income tax in 1891, when the original permission to tax was granted.   But taxation policies and systems change with necessities and experience, and no support can be found in the Act for a belief that Congress consented to state taxation only if Arkansas would make its 1891 tax system static.   If we accept appellant's premise that what Congress consented to was ad valorem taxation only, we must conclude that Congress consented to a tax under which Arkansas was collecting virtually all of its revenues in 1891.   Since 1900, state governments—Arkansas included—have tended to secure less and less of their revenue from ad valorem taxation, and more and more from taxes of other types.[8]   The Arkansas legislature, in fact, in the preamble to the 1929 income tax act, gave as a reason for its adoption that "Agricultural and Industrial development is now being retarded because of a policy to secure practically all of the Revenue from an Advalorem Tax, thus penalizing and discouraging ownership of property, . . ."[9]   The narrow construction of the Act urged by appellant—a corporation created under the laws of Arkansas—would thus relieve it from an Arkansas tax on corporate income enacted, at least in part, as a substitute for those state ad valorem taxes to which appellant admits it is subject.   And "The privilege of use is only one attribute, among many, of the bundle of privi-

---

[7] Cf. *Fidelity & Deposit Co.* v. *Arenz,* 290 .U. S. 66, 68.

[8] Arkansas, for example, received approximately 77% of its total revenue from general property taxes in 1915, while in 1937 this source accounted for only 13%.   Financial Statistics of States, 1915, Table 3, pp. 66–67; *id.,* 1937, Table 5, pp. 36–41.

[9] Ark. Acts (1929) No. 118.   Compare the preceding footnote.

leges that makes up property or ownership." [10]   It is our opinion that the decision below must be affirmed. [11]

*Affirmed.*

MR. JUSTICE STONE, concurring:

MR. JUSTICE ROBERTS and I concur in the judgment of the Court but upon different grounds from those stated in its opinion.

The state court has held that so far as the state constitution and laws are involved it has power to lay the present tax. It is no concern of ours what reasons are assigned for that conclusion. The only question for decision here is whether there is anything in the acts of Congress establishing the reservation or in the relationship of the two sovereignties, state and national, to prevent the state from laying a tax on the net income of its own corporation.

If the consent of the national government were needful in order to sustain the present tax we should have difficulty in finding that consent in the words of the Act of Congress authorizing the state to tax "all structures and other property in private ownership on the . . . reservation." But we think that such consent is unnecessary to enable a state to tax the income of its own corporations, derived from property located on the reservation. It is enough that no Act of Congress and no agreement by the state with the Federal Government prohibits the tax.

The fact that income-producing property is physically located on the territory of another sovereignty does not foreclose the state from taxing its own residents and corporations on the income derived from the property.

[10] *Henneford* v. *Silas Mason Co.*, 300 U. S. 577, 582.

[11] Cf. *Buckstaff Bath House Co.* v. *McKinley*, 308 U. S. 358; *Collins* v. *Yosemite Park & Curry Co.*, 304 U. S. 518.

*Cohn* v. *Graves,* 300 U. S. 308; *Lawrence* v. *State Tax Comm'n,* 286 U. S. 276; see *Newark Fire Insurance Co.* v. *State Board,* 307 U. S. 313. We have recently held that such a tax is not a tax on the income-producing property in any such sense as to preclude the tax for want of "jurisdiction" of the state to lay it. *Cohn* v. *Graves, supra,* 313, 314; *Graves* v. *O'Keefe,* 306 U. S. 466, 480. There is no occasion now to give renewed currency to the notion erroneously attributed to *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429; cf. *Cohn* v. *Graves, supra,* 314, 315, that a tax on income is subject to the limitations of a tax on the property which produces it.

For that reason if Arkansas had made an unrestricted grant of the reservation it could not be said to have renounced its authority to tax income of its corporations or citizens derived from property on the reservation, more than if it were located in the District of Columbia or in another state. It clearly has not done so by reserving the right to lay a property tax within the reservation or by agreeing that the United States shall have exclusive jurisdiction over it for any or for every purpose. The state's power to lay the tax, being independent of its jurisdiction over the ceded territory, subsists unless waived or prohibited by competent authority.

Whatever constitutional power the Federal Government may have to prohibit the state taxation of income derived from property located on the reservation, regarded as a federal instrumentality, it is plain that it has not assumed to exercise the power. *Graves* v. *O'Keefe, supra,* 480. Since the state has not surrendered its constitutional power to tax the income and since Congress has not assumed in the act establishing the reservation, or otherwise, to prohibit the tax, the power of the state is unimpaired, unless restricted by its own constitution and laws.

Mr. Justice Frankfurter while agreeing with the Court's opinion also agrees with the view expressed in this opinion.