[Civ. No. 15115. First Dist., Div. One. May 19, 1952.]

GENERAL ELECTRIC COMPANY (a Corporation) et al., Appellants, v. STATE BOARD OF EQUALIZATION, Respondent.

Cooley, Crowley & Gaither, William W. Godward, Edwin E. Huddleson, Jr., Robert H. Gerdes, Richard H. Peterson and William B. Kuder for Appellants.

Edmund G. Brown, Attorney General, James E. Sabine, Irving H. Perluss, and Ernest P. Goodman, Deputy Attorneys General, for Respondent.

PETERS, P. J.—The question involved in this case is whether the manufacturer-installer of a 521-ton turbine generator unit, which upon installation became an improvement to the real property of the buyer, is taxable under the Sales and Use Tax Law (Rev. & Tax. Code, §§ 6001-7176) as a seller at retail, or as a consumer of the parts and materials of which the generator was composed. The State Board of Equalization ruled that such manufacturer-installer sold the generator as tangible personal property at retail, and taxed the transaction as such. It denied a claim for refund. This action was then instituted to recover the claimed overpayment of the tax. The trial court held that the state board had imposed the proper tax, denied the claim for refund, and entered its judgment accordingly. The manufacturer-installer and its purchaser, who in fact paid the tax, appeal.

There is no dispute as to the facts. On December 31, 1947, General Electric Company (hereafter referred to as General), a New York corporation that is qualified to do business in California and which is primarily a manufacturer of electrical equipment, entered into a contract with Pacific Gas and Electric Company (hereafter referred to as Pacific), a California company, under which General agreed to fabricate and install a turbine generator for Pacific as an integral part of Pacific's steam electric plant in Kern County. The full contract price was $1,164,797.85, including the cost of installation, which turned out to be $36,500. The contract provided that General "agrees to construct the turbine generator described herein at Pacific's Kern Steam Plant." It contains certain warranties, an agreement by General to defend and protect against any patent suits, and provided for progress payments, 80 per cent of the full purchase price being payable during fabrication, 10 per cent more upon shipment, and the balance upon installation. The contract required General to furnish the cost of labor and materials in fabricating the generator and in installing it, except that Pacific was to provide the foundation and bolts and grouting necessary to install, a

suitable crane with operator, a spur track, etc. Although the contract is silent as to risk of loss, the evidence indicates that General considered such risk to be on it until installation. Title remained in General until installation, when it passed to Pacific.

Each generator of the general type of the one here involved is specially designed by General to fit the needs of its customer. General is not engaged in the general construction business for the utility industry, but, because of the complexity of this type of machinery, insists on installing it. There are only two other concerns engaged in this business in the United States, and they too follow the practice of installing such equipment. Pacific always buys such equipment installed.

The generator here involved is a very large, very precise, and a very complex piece of machinery. It is designed to generate steam, which passes into a turbine, where it causes a rotary motion, which turns a generator that generates electric energy. It is the key piece of equipment in the steam plant, all other equipment being related to it. The building housing the generator, which building was constructed by Pacific, was specially designed to fit this particular piece of equipment, and has no other purpose or utility. The generator weighs about 521 tons, and is roughly 70 feet long, 22 feet wide and 19 feet high. It is attached to a concrete foundation with large bolts and cement. In spite of its size, it is a precision instrument.

The generator was manufactured by General at its factory in New York. The cost of the materials used in its manufacture was $263,990.17. It was completely assembled and tested in New York by General. Then, because of its size, it was dismantled and shipped to Kern County in 14 freight cars. There it was installed by General, under the supervision of General's engineers, on a foundation constructed by Pacific. Installation took from January, 1948, to May, 1948. The equipment is expected to last indefinitely and to remain in place until obsolescence requires the plant to be scrapped or rebuilt.

Pacific has the fee title to the site where the steam plant is located. On the first Monday of March, 1948, when the generator was about half installed, Pacific reported to the state board, for real property tax purposes, its entire plant, including the generator, as "construction work in progress." In 1949 the entire plant, including the generator, was taxed

as realty to Pacific. No part of the assembled portion of the generator was ever taxed to General as personal property.

General, in compliance with rule 11 of the state board, paid a sales tax of $28,207.45, which was calculated on the full contract price of $1,164,797.85 less a credit of $36,500 for installation. General contends it should have paid a tax computed solely on $263,990.17, the cost of the materials to it, or a tax of $6,750.70. It paid all in excess of this amount under protest, contending that it has been subjected to a $21,456.75 overpayment. Pursuant to the terms of the contract Pacific has reimbursed General for the total tax paid, and is the beneficial owner of the claim for refund.

On these facts the trial court concluded that, as to General, the generator was tangible personal property and the transaction constituted a sale of tangible personal property in California by General to Pacific within the meaning of the Sales and Use Tax. Rule 11 was upheld as reasonable and nondiscriminatory. It was therefore concluded that the transaction was properly subject to the sales tax in the full amount paid.

General's basic contention is that the state board should have imposed a use tax under section 6201 of the Revenue and Taxation Code upon this transaction, and not a sales tax. Section 6201 imposes an excise tax at a fixed rate ''on the storage, use, or other consumption in this State of tangible personal property purchased from any retailer . . . for storage, use, or other consumption in this State.'' If General is subject only to this tax, admittedly such tax, under the above section and section 6011 of the same code, would be measured by the cost to General of the raw materials which it fabricated into the generator.

The state board contends that the transaction is subject to a tax on the theory that General sold to Pacific tangible personal property in this state, that is, sold the completed generator to Pacific, and hence General was a retailer of tangible personal property under the provisions of the Revenue and Taxation Code. Section 6015(a) of that code defines a retailer as ''Every seller who makes any retail sale or sales of tangible personal property. . . .'' Section 6006 provides that:

'' 'Sale' means and includes:

''(a) Any transfer of title or possession, . . . in any manner or any means whatsoever, of tangible personal property for a consideration. . . .

"(g) A transfer for a consideration of the title or possession of tangible personal property which has been produced, fabricated, or printed to the special order of the customer . . ."

Section 6051 provides: "For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers [at a fixed rate] of the gross receipts of any retailer from the sale of all tangible personal property sold at retail in this State."

In developing their argument that General was a consumer of the materials that went into the completed generator, and not a retailer of tangible personal property, appellants first argue that the property involved never was personal property in the hands of Pacific, so that no sale of personal property could have taken place. It is pointed out that title did not pass to Pacific until the generator was affixed in place, at which moment it became real property and taxable as such.

It is undoubtedly true that upon annexation the generator became an improvement to real property, a fixture, and taxable as such. (Rev. & Tax. Code, §§ 104, 105; Civ. Code, § 660; *San Diego T. & S. Bank* v. *San Diego County*, 16 Cal. 2d 142 [105 P.2d 94, 133 A.L.R. 416]; *Trabue Pittman Corp.* v. *County of Los Angeles*, 29 Cal.2d 385 [175 P.2d 512].)

However, the argument that, because the generator became taxable as real property in the hands of Pacific, the transaction by which title was transferred to Pacific by General is conclusively determined to be not a sale, is unsound. The generator in place was clearly real property and taxable as such. But we are not interested in the nature of the property in the hands of the buyer, but in its nature in the hands of the seller—General. The sales tax is imposed on the seller, not upon the buyer. Section 6006 of the Revenue and Taxation Code defines a sale as "Any transfer of title . . . in any manner or any means whatsoever." Clearly, title passed from General to Pacific. In General's hands the title it possessed was title to personal property. General never had title as real property. What it had it passed to Pacific, and that was title to tangible personal property. That is all that is required by the act. This argument of appellants lacks substance.

The much more interesting and complex argument of appellants is that General constructed the generator for Pacific and primarily furnished services in fabricating it and did not sell the completed article as personal property. The statute

imposes no tax on services. (Rev. & Tax. Code, § 6011.) There are many articles manufactured by the seller where some portion of the sales price is represented by the cost of assembling or manufacturing, but, neverthless the transaction is treated as a sale of tangible personal property. Thus the optometrist, although a great proportion of the total cost of eyeglasses is the service in grinding the lens, is deemed in this state to be a retailer and not a consumer, and so subject to section 6051 and not to section 6201 of the Revenue and Taxation Code. (*Kamp* v. *Johnson,* 15 Cal.2d 187 [99 P.2d 274].)*

This problem arises, in varying degrees, in many fields. When we come to structures and fixtures attached to realty,. the statute does not define, with minute precision, the division line between the sale of tangible personal property, and the sale of services. Close questions are bound to occur. The Legislature has seen fit to leave the determination of these questions to the state board under its rule-making power. In adopting rules that are intended to apply generally it is obvious that borderline cases will occur where it will be very difficult to ascertain whether the sale is primarily of property or of services. So far as contractors are concerned, the state board has attempted to solve the problem by the adoption of ruling No. 11. (18 Cal. Adm. Code, § 1921.) So far as pertinent here, that rule provides:

"(1) The term 'contractor' as used herein includes both general contractors and subcontractors and includes contractors engaged in such building trades as carpentry, bricklaying, cement work, steel work, plastering, sheet metal work, roofing, tile and terrazzo work, electrical work, plumbing, heating, air conditioning, painting and interior decorating.

"(2) The term 'construction contract' as used herein means a contract for erecting, remodeling, or repairing a building or other structures on land and includes lump-sum, cost-plus, and time-and-material contracts. The term 'construction contract' does not include a contract for the sale and installation of machinery or equipment.

"(3) The term 'materials' as used herein means tangible personal property which when combined with other tangible personal property loses its identity to become an integral and inseparable part of the completed structure. . . .

"(4) The term 'fixtures' as used herein means things which

---

*(In 1947 the rule of this case was changed by statute—Revenue and Taxation Code, section 6018; Statutes of 1947, page 656, chapter 139.)

are accessory to a building and which do not lose their identity as accessories when placed or installed. . . .

"(b)(1) Contractors are consumers of materials used by them in fulfilling construction contracts and the tax applies to the sale of such materials to the contractors. . . .

"(c) Contractors are retailers of 'fixtures' which they furnish and install and tax applies to the retail selling price thereof; which, in the case of lump-sum construction contracts, is regarded as the cost price of the fixtures to the contractors. If the contractor is the manufacturer of the fixtures, the retail selling price thereof is the prevailing price at which similar fixtures in similar quantities ready for installation would be sold to contractors."

By this rule the state board has attempted to distinguish between "structures" and "fixtures." Where the materials are combined with other materials so as to lose their identity and become part of the completed structure the contractor is deemed to be the consumer of such materials and is required to pay a tax measured by section 6201 of the Revenue and Taxation Code. But when the contractor, whether or not he is the manufacturer, furnishes a fixture that does not lose its identity upon annexation, the transaction is deemed a sale and is measured by section 6051. Thus, in the construction of a structure the contractor is deemed to be engaged primarily in the sale of services, and is deemed to be a "consumer" of the materials used. But in the construction, installation and sale of a fixture, the contractor is deemed to be a retailer of tangible personal property.

It was under this rule that the state board acted in treating the transaction here involved as the sale of a generator and not the sale of services. There can be no doubt that under this rule the transaction was a sale of tangible personal property and taxable as such. . But appellants argue that the constructor of an improvement to real property, whether he constructs a "structure" or a "fixture," is necessarily engaged in the business of selling services, and that the classification contained in rule 11 is not predicated on any reasonable basis, is discriminatory, and is invalid.

Rule 11, or a rule substantially similar to it, has been in effect for many years. It is an attempt to distinguish between contractors primarily selling services and those primarily selling property. Considered as an original proposition, the classification between the construction of those structures where the individual materials lose their identity in the com-

pleted structure, and the construction of fixtures that, although attached to realty, do not lose their identity upon annexation, treating the first as a sale of services and the second as a sale of property, is reasonable and fair. ■ Rule-making bodies have a wide discretion in exercising the power to classify. As long as the rule works uniformly upon all persons in a class and the classification is based upon some natural or reasonable distinction, the classification is not invalid. (*Martin* v. *Superior Court*, 194 Cal. 93 [227 P. 762].) ■ Classifications will not be overthrown unless plainly arbitrary. (*In re Schmolke*, 199 Cal. 42 [248 P. 244]; *County of Los Angeles* v. *Hurlbut*, 44 Cal.App.2d 88 [111 P.2d 963].)

■ In the instant case the statute involved does not define, with precision, what shall constitute a sale of services and what shall be deemed a sale of property. The Legislature has provided that in the sale of services the contractor shall be deemed a consumer of materials and taxed as such, but in the sale of property he is a retailer of property and taxed as such. The enforcing agency, acting under its rule-making power, has seen fit to classify between materials that lose their identity and those that do not, between structures and fixtures. This seems to us a reasonable and sound classification.

The appellants, however, contend that the problem is no longer an open one, and that the case of *Chicago Bridge & Iron Co.* v. *Johnson*, 19 Cal.2d 162 [119 P.2d 945], determines that General was subject only to the consumer's tax and not to the retailer's tax. It is upon this decision that appellants pin their main hope for a reversal. In that case the contractor was engaged in the manufacture and installing of large steel tanks. These were manufactured at the company's plant outside of California to the purchaser's specifications. They were so large that they could not be shipped to California in a single unit, but were prefabricated and the component parts shipped to this state. The parts were then assembled by the manufacturer and installed by it on the purchaser's property. The state board held that the manufacturer was a consumer of materials and imposed a use tax measured by the cost of these materials to the manufacturer. Rule 11 was not mentioned. No attempt was made to impose a sales tax measured by the selling price of the completed unit. The manufacturer claimed that it was not subject to any tax at all. It urged that when goods are purchased in a foreign state, prefabricated and shipped to California in interstate commerce, to tax the manufacturer on the cost of the materials

is to impose an invalid burden on interstate commerce. That was the main point involved. The court held that the use tax did not constitute an unconstitutional burden on interstate commerce. The only points decided were that the state board had imposed a use tax on the transaction and that such tax was valid.

There are undoubtedly similarities between the Bridge case and the instant one. In both cases the articles involved were prefabricated by the manufacturers, shipped in sections to California, and here assembled and installed on foundations constructed by the purchasers. In both cases the articles involved became improvements to real property and became taxable as such. Neither the generator nor the steel tank functions as a building. Many of the provisions of the two contracts are substantially similar. But the Bridge case is not controlling here for at least two reasons:

First, rule 11 was not mentioned by the court. The state board had seen fit to treat the manufacturer of the tanks as the consumer of materials and, since such materials were purchased outside of California, imposed a use tax measured by the cost of the materials, on such manufacturer. No question was ever raised that the manufacturer might have been a retailer of the steel tanks, and therefore subject to the sales tax. The court did not pass on that point at all, because that point was not raised. The case stands for the proposition that such a manufacturer at least is subject to the use tax, and that such imposition is valid. It does not necessarily stand for the proposition that the manufacturer might not have been subject to the sales tax instead of the use tax. That alternative was not presented to the court. The case, at most, is merely an argumentative authority on that subject. The two taxes are, of course, mutually exclusive, and it can be and is argued that a decision that a manufacturer is subject to the use tax necessarily decides that it is not liable to a sales tax. But it is perfectly clear that the Supreme Court did not decide upon the validity of the classification contained in rule 11, nor upon the application of that rule to the facts, because that rule was not mentioned nor discussed.

Secondly, while there are many similarities in the facts of the two cases, some of which have been mentioned, there are also some differences, differences of such a nature that it would have justified the state board in applying the first part of rule 11 to the manufacturer in the Bridge case and the second part of that rule to the manufacturer here involved. As we

have seen, rule 11 classifies between structures and fixtures. The steel tank, with its walls, floor and a roof might well be classified as a "structure," while a generator is undoubtedly a "fixture" as that term is used in the rule. That distinction may be a tenuous one, but, as already pointed out, in determining whether a contractor is selling property or services there are bound to be many close cases. The state board has seen fit to draw that line between structures and fixtures. That classification is reasonable. In most cases, the differences between the two will be obvious. But cases are bound to arise where it will be difficult to ascertain whether the completed unit is a "structure" or a "fixture" as those terms are used in the rule. That difficulty is inherent in the application of any classification, and does not render the classification invalid. The state board might well have determined that the steel tank was a structure, and that the generator a fixture, and such determinations would not necessarily be inconsistent. The California Supreme Court stated the proper rule in *Ferrante* v. *Fish & Game Com.*, 29 Cal.2d 365, 374 [175 P.2d 222], where it stated:

"Similar apparent hardships are inherent in every classification made for the purpose of regulation. Some close cases must always fall just inside and others just outside of the line delimiting the class, wherever drawn, and the regulation will appear to operate with especial harshness upon those which happen to fall just inside. But the line must be drawn somewhere or there can be no classification and the courts have recognized that if the classification is reasonable in its overall operation it is not to be stricken down because of its application to a particular case that may lie just inside its borders. Chief Justice Hughes said tersely in *Continental Baking Co.* v. *Woodring*, 286 U.S. 352, 370-371 [52 S.Ct. 595, 76 L.Ed. 1155]:

" 'It is obvious that the legislature in setting up such a zone would have to draw the line somewhere and unquestionably it had a broad discretion as to where the line should be drawn.'

"Justice Holmes in *Dominion Hotel* v. *Arizona*, 249 U.S. 265, 269 [39 S.Ct. 273, 63 L.Ed. 597], elaborated the same idea:

" 'If in its theory the distinction is justifiable, as for all that we know it is, the fact that some cases, including the plaintiff's, are very near to the line makes it none the worse. That is the inevitable result of drawing a line where the dis-

tinctions are distinctions of degree; and the constant business of the law is to draw such lines. "Upholding the act as embodying a principle generally fair and doing as nearly equal justice as can be expected seems to import that if a particular case of hardship arises under it in its natural and ordinary application, that hardship must be borne as one of the imperfections of human things." *Louisville & Nashville R. R. Co. v. Barber Asphalt Pav. Co.,* 197 U.S. 430, 434 [25 S.Ct. 466, 49 L.Ed. 819].' "

Appellants next urge that the majority of cases outside California draw no distinction between the construction of structures and the construction of fixtures, and urge that in those states, in both situations, the manufacturer is treated as a consumer. It is true that, with the exception of Illinois, no state, except California, seems to have attempted to distinguish between structures and fixtures. However, as respondent correctly points out, the cases cited by appellants to support their argument are all concerned with what under rule 11 would be building materials and structures, and would, therefore, fall within the first part of rule 11. In other words, those cases would have been decided in California as they were in the foreign states.

The state of Illinois had a regulation somewhat similar to rule 11 that attempted to draw a distinction between contractors, and sellers of fixtures. The Supreme Court of that state in *Material Service Corp.* v. *McKibbin,* 380 Ill. 226 [43 N.E.2d 939], declared the administrative regulation invalid. The classification was declared not to be reasonable.

The case undoubtedly supports the position of appellants, but in our opinion it is not controlling and should not be followed. Illinois is a state that has gone quite far in holding various transactions not taxable. It has held that neither the contractors, nor the materialmen selling property to them, are retailers, which is clearly contrary to California law. It has held that optometrists are neither retailers nor consumers. (*American Optical Co.* v. *Nudelman,* 370 Ill. 627 [19 N.E.2d 582].) California specifically refused to follow the Illinois rule in *Kamp* v. *Johnson,* 15 Cal.2d 187, 190 [99 P.2d 274]. For reasons already stated, we believe that the classification in rule 11 is valid. Thus, even if the Illinois statute and rule were identical with those here involved, which they are not, the reasoning of the Illinois court is not convincing.

The next contention of appellants is that rule 11 is inconsistent with rule 12. (Cal. Adm. Code, § 1922.) Rule 12

deals exclusively with contractors with the United States government and, in effect, treats such contractors as "consumers" of "fixtures" sold to the government. Such contractors are thus treated differently than contractors generally under rule 11. This, it is claimed, is unlawful discrimination against appellants.

Rule 12 was made necessary by the specific provisions of the tax statute. Section 6381 of the Revenue and Taxation Code exempts from the sales tax gross receipts derived from the sale of tangible personal property to the United States. Section 6384 of that code, in order that the state shall collect some tax, requires that contractors shall be regarded as consumers. Unless they were so treated, contractors with the United States would pay no tax at all. This appears to be a reasonable basis for this classification between contractors.

This opinion has held that the classification in rule 11 is reasonable and nondiscriminatory. That is the basic point involved—is it reasonable to tax fixtures differently from structures? As we have pointed out, the nature of the business of constructing structures is primarily the rendition of service and the consumption of materials. The constructors use or consume the materials that go into the completed structure. But the fabricator or constructor of a fixture is primarily selling that completed fixture. This is a real, basic and reasonable difference that justifies the classification.

█ The last contention of appellants is that the trial court erroneously refused to grant it a declaratory judgment as to the validity of rule 11. The appellants prayed, in a second cause of action, for such relief, alleging that they had petitioned the state board under section 11426 of the Government Code to repeal or amend rule 11 on the ground that, as written, it was invalid, but the board refused to decide such petition until this case was finally decided. It is urged that under section 11440 of the Government Code and section 1060 of the Code of Civil Procedure appellants are entitled to a declaratory judgment. The trial court concluded that declaratory relief is not necessary or proper at this time under the circumstances.

We do not find it necessary to determine whether declaratory relief is applicable in tax cases. It is obvious that appellants have had a complete and adequate remedy under their first cause of action. The action for declaratory relief seeks a determination that rule 11 is invalid. That is precisely their contention under the first cause of action. Every point of

claimed invalidity under the declaratory relief cause of action was raised in the cause of action for the refund. We have determined that as against such attacks rule 11 is valid. It is reasonable and is not discriminatory. Thus, no need exists for a further declaration of rights. Appellants have had their declaration in the holding of the trial court and of this court in this opinion.

The judgment appealed from is affirmed.

Bray, J., and Dooling, J. assigned, concurred.

The opinion was modified to read as above printed and a petition for a rehearing was denied June 18, 1952.

Appellants' petition for a hearing by the Supreme Court was denied July 17, 1952.