[Sac. No. 7356. In Bank. Nov. 14, 1963.]

UNION OIL COMPANY OF CALIFORNIA, Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

Hart H. Spiegel and Brobeck, Phleger & Harrison for Plaintiff and Appellant.

Stanley Mosk, Attorney General, Ernest P. Goodman and John J. Klee, Jr., Deputy Attorneys General, for Defendant and Respondent.

TOBRINER, J.—In this controversy as to the application of the California use tax to an extra-state sale and leaseback of two tankers we hold that an owner of property "uses" it under the tax statute when he leases it. The use of the lessor through the lease in California is a California use. The trial court's finding that the purchaser at the date of the transaction anticipated that the lessee would use the vessels in California, and the subsequent actual use in California, render the transaction a purchase for use in this state. Hence the purchaser is liable for the tax upon the basis of the purchase price. No constitutional prohibitions prevent California's application of its use tax to the transaction. We

shall proceed, *infra*, to point out in more detail the reasons for these conclusions.

The case involves the attempt of Union Oil Company (hereinafter called Union) to recover the amount of $151,800 which Union, as tax collector, paid as use taxes for Cienega Tanker Corporation (hereinafter called Cienega), the true taxpayer.

The Board of Equalization assessed the tax in view of the following facts. Union entered into a contract in New Jersey to sell to Cienega the two bulk oil tankers, which, according to the contract, would immediately be leased back to Union. Union subsequently operated the tankers in California. Since the sale of the tankers occurred outside California the sales tax did not apply. California, however, called upon Union to collect a use tax from Cienega. Sections 6203 and 6204 of the Revenue and Taxation Code require a retailer maintaining a place of business in this state to collect such a use tax. Union does not dispute that it is a retailer maintaining a place of business in this state. It maintains, however, that Cienega did not incur such a use tax liability, and that Union, as tax collector, should accordingly be refunded the amount of the tax.

The trial court found that the two vessels, the S. S. Santa Paula and S. S. Lompoc, "were purchased by Cienega from a retailer (Union) for use and consumption in the State of California and were used and consumed by Cienega in the State of California." The court therefore sustained the assessment. The finding rested upon the parties' stipulation of facts which discloses the details of the transaction.

Thus the parties entered into a contract at Jersey City, New Jersey, which provided that Cienega take legal title to the vessels and that physical possession be transferred at Astoria, Oregon or such other United States port as Union might designate. The purchase price for each vessel was $2,200,000. The contract further stipulated that concurrently with the delivery of the vessels Cienega would execute a bareboat charter for each vessel.[1] The period for the charter

[1] The terms of the charters reserve to Cienega certain rights incident to its ownership: a prohibition against illegal operation or the carrying of cargo that might expose either vessel to "penalty, forfeiture or capture," and another provision which imposes upon Union the obligation to drydock the vessels at least once annually and comply with a maintenance standard entitling the vessels "to the highest classification and rating of the American Bureau of Shipping." In accord with these

for the S. S. Santa Paula was two years; that for the S.S. Lompoc, four years. Union enjoyed an option to extend the charter period for each vessel for one year.

The parties promptly executed the contract: Union delivered the ships to Cienega at Astoria, Oregon; Cienega concomitantly executed a bareboat charter for each vessel and redelivered physical possession to Union.

While we cannot assume that the sale and leaseback transactions were not bona fide, we note that the physical utilization of the two ships in the year immediately preceding, and the year immediately following, the transactions remained significantly consistent. Union did not deviate from the customary pattern of employment of the vessels. In the year preceding their transfers the Santa Paula and the Lompoc spent 252 and 289 days respectively in intrastate commerce in this state; in the year following the transfers these vessels spent 312 and 335 days respectively in predominantly California activity.

The parties do not dispute the fact that if any of the significant elements of the foregoing transactions had transpired within California the transfer would have been subject to our sales tax; since, however, no transfer of title or possession occurred in this state, no sales tax accrued. At the time of these events, moreover, neither the place of execution of the contract of sale (New Jersey) nor the point of delivery and redelivery of the vessels (Oregon) imposed either a sales tax or a use tax.

The case raises the basic issues whether the trial court properly found: (1) a taxable "use" of these vessels occurred in California subsequent to their sale; (2) the purchaser (Cienega) contemplated, at the date of such transfer, the essential condition of such "use"; (3) the statute itself did not exempt from taxation Cienega's use of the property, and (4) California did not violate any constitutional prohibition in imposing the tax. We set forth in the above sequence our reasons for concurrence with the trial court.

In analyzing the first issue, we shall point out that

protective clauses, Cienega retained the right to inspect the vessels in drydock upon notification and at any other reasonable times to inspect the vessels and their logs. Union has complied with the requirement that it pay monthly charter hire in New York funds by writing checks in California drawn on New York banks where funds deposited for such purposes are available for Cienega's convenience.

the statutory definition of "use" includes the owner's use of the property by means of leasing it, and that, further, such an interpretation accords with the statutory design that the use and sales taxes be interpreted as complementary taxes.[2]

The statutory definition of "use" includes that exercise of dominion over property which takes the form of leasing it. The definition reads: " 'Use' includes the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it does not include the sale of that property in the regular course of business." (Rev. & Tax. Code, § 6009.) The lease is an articulation of that right incident to the ownership of the property. Ownership is not a single concrete entity but a bundle of rights and privileges as well as of obligations.[3] It finds expression through multiple methods. One such method is the lease. And where the owner physically uses the leased property, there, indeed, the ownership is exerted. When the tankers enter California the owner continues the exertion of its right of ownership through the instrument of the lease; the owner "uses" the tankers in California. The taxing authority at the location where the owner expresses or exercises such ownership may properly find that such use constitutes a taxable use.

The statutory definition recognizes that the term "use" covers the utilization of property for profit-making purposes by means of leasing; the word "use" is by no means restricted to physical manipulation. Thus Webster's New Twentieth Century Dictionary (1950) states as one of the meanings of the word, "The act of handling or employing in any manner, and for any purpose, but especially for a profitable purpose; the state of being employed; employment; ap-

---

[2]Relevant sections of the statute provide: Rev. & Tax Code, § 6201: "An excise tax is hereby imposed on the storage, use, or other consumption in this State of tangible personal property purchased from any retailer... for storage, use, or other consumption in this State...." Rev. & Tax Code, § 6202: "Every person storing, using, or otherwise consuming in this State tangible personal property purchased from a retailer is liable for the tax. . . ." (See J. Gould, The Cal. Tax System, 59 West's Ann. Cal. Codes, p. 51.)

[3]*Henneford* v. *Silas Mason Co.* (1937) 300 U.S. 577, 582 [57 S.Ct. 524, 81 L.Ed. 814, 818]; *Superior Bath House Co.* v. *McCarroll* (1941) 312 U.S. 176, 180-181 [61 S.Ct. 503, 85 L.Ed. 721, 724-725]; *In re Hunter's Estate* (1951) 125 Mont. 315 [236 P.2d 94, 99]; *United States* v. *Gossler* (D.C. Ore. 1945) 60 F.Supp. 971.

plication; conversion to a purpose. . . ." Likewise, a Kansas court, in defining the word and describing the extent of a bequest of property in trust "for *the use* and benefit" of the mother of a testatrix, holds: " 'As a general rule, the use of a thing does not mean the thing itself, but means that the user is to enjoy, hold, occupy, or have in some manner the benefit thereof. If the thing to be used is in the form or shape of real estate, the use thereof is its occupancy or cultivation, etc., *or the rent which can be obtained for its use.* If it is money or its equivalent, generally speaking, it is the interest which it will earn.' 29 A. & E. Ency. of Law, 444." (*Elwell* v. *Stewart* (1922) 110 Kan. 218 [203 P. 922]; italics added.)

Our interpretation finds corroboration in section 6201, which imposes the use tax upon "storage, use, *or other consumption*" in this state. (Italics added.) As the court in *In re Los Angeles Lumber Products Co.* (D.C. S.D.Cal. 1942) 45 F.Supp. 77, has said in regard to the use tax, " . . . not only 'use' but also 'storage' or 'other consumption' is taxable under the Use Tax Act." (P. 82.) The word "consumption" encompasses a gradual "using up or wearing away of something" (Webster's Third International Dictionary); to the extent that a deterioration, even though imperceptible, occurred in California, "consumption" of the vessels ensued. The tax applies to "all consumers" (Traynor, *The California Use Tax* (1936) 24 Cal.L.Rev. 175, 177), including the gradualist consumer.

█ The words "other consumption" are supplementary, not surplusage, to the remaining words of the section (*Weber* v. *County of Santa Barbara* (1940) 15 Cal.2d 82, 86 [98 P.2d 492]) and "significance should be given" to them (*Select Base Materials, Inc.* v. *Board of Equalization* (1959) 51 Cal. 2d 640, 645 [335 P.2d 672]). The vessels were actually used in California; here, too, the consumption as well as the use, took place.

█ The concept that Cienega used and consumed the vessels in California effectuates the basic purposes of the use tax and the broad statutory construction which we must accord its provisions.[4] █ As we stated in *Chicago Bridge &*

---

[4]Our construction of statutory terminology must rest upon the legislative objectives; these we are bound to effectuate. (*Select Base Materials, Inc.* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *City & County of San Francisco* v. *County of San Mateo* (1941) 17 Cal.2d 814, 818 [112 P.2d 595].) We note that the legitimacy of the

*Iron Co.* v. *Johnson* (1941) 19 Cal.2d 162, 165 [119 P.2d 945]: "One of these purposes is to make the coverage of the tax complete to the end that the retail sales tax ... will not result in an unfair burden being placed upon the local retailer engaged solely in intrastate commerce as compared with the case where the property is *purchased for use* or storage in California and is used or stored in this state. The two taxes are complemental to each other with the aim of placing the local retailers and their out-of-state competitors on an equal footing." (Italics added; see also *Brandtjen & Kluge, Inc.* v. *Fincher* (1941) 44 Cal.App.2d Supp. 939, 941-942 [111 P.2d 979], and Traynor, *The California Use Tax* (1936) 24 Cal.L. Rev. 175, 176-177.)

If the California businessman, intending to buy property for use in California, could avoid the sales tax merely by purchasing the product outside the state, the local retailer would suffer a severe commercial disadvantage. Hence California imposes an excise tax upon the purchaser of tangible personal property in the event that, having paid no sales tax to California on the purchase, he proposes to and actually does store, use, or otherwise consume such property in this state.

In substance, the sales and use tax laws constitute a double filter designed to catch all transactions which result in tangible personal property joining the aggregate of capital assets within this state. In modern commercial practice capital assets available for lease compete with those available for ownership.[5] As we have explained, the Legislature designed

use tax goal has been recognized by the United States Supreme Court: "The Use Tax Act is complemental to the California Retail Sales Tax Act of 1933. The latter levies a tax upon the gross receipts of California retailers from sales of tangible personal property; the former imposes an excise on the consumer at the same rate for the storage, use or other consumption in the state of such property when purchased from any retailer. As property covered by the sales tax is exempt under the use tax, all tangible personalty sold or utilized in California is taxed once for the support of the state government." (*Southern Pacific Co.* v. *Gallagher* (1939) 306 U.S. 167, 171 [59 S.Ct. 389, 83 L.Ed. 586, 589-590].)

[5]Business enterprises have traditionally acquired operating machinery and equipment by purchase. Only in recent years has the field of industrial equipment leasing expanded to the magnitude of a billion dollar industry as attested by current articles featured in legal and financial publications. (See, e.g., *Equipment Leasing* (Spring 1962) U.Ill.L.F. 1-97; *Leasing Equipment is Big Business Today,* Magazine Wall Street, vol. 111, issue 1 (Sept. 22, 1962) p. 33; *Equipment Leasing Now Big*

the Sales and Use Tax Law as an integrated whole. Such a design is incompatible with an interpretation of the statutes which would leave a loophole of competitive advantage for the interstate over the intrastate lessor. The use tax, correctly applied, constitutes a legitimate expense exacted for the privilege of enjoying the advantages of the California economy.

 Cienega thus becomes the owner and consumer of property which it uses to produce rental income. In terms of the sales tax laws the sale to it would be a taxable sale. An equivalent result should occur as to the tax liability under the use tax laws. ''[W]hen a person buys property in one state for the purpose of leasing it and transporting it to a person in another state where a use tax law is in effect, the lessor is considered as using the property in the second state for the production of income and hence is subject to such state's use tax even though he personally makes no physical use of the property in such state.'' (Keesling, *Conflicting Conceptions of Ownership in Taxation* (1956) 44 Cal.L.Rev. 866, 867.)[6]

 Having determined that Cienega used the property in California and that the transaction under the sales tax laws would be a taxable sale, we believe that the state properly assessed the use tax upon the sale price which the purchaser paid for the vessels. Although Union has suggested at oral argument that if any use tax were at all to be levied it should have been based upon the rental value of the property, we shall briefly explain why the tax must be imposed upon the purchase price of the vessels.

The use tax does not depend upon the *duration* of the use in California but upon the *fact* of *any* substantial use in

---

*Business,* Financial World, vol. 117, issue 19 (May 9, 1962) p. 6; *Machines Without Owners,* Fortune, vol. 66, issue 2 (August 1962) p. 112; *More Firms are Leasing Equipment,* The Office, vol. 58, issue 2 (August 1962) p. 166.)

[6]As Union points out, Mr. Keesling advocates, in two footnotes, that a lease should be treated as the sale of a portion of ownership interest. Then either the lessor would pay a sales tax upon gross rental receipts or the lessee would be required to pay a use tax upon the rental price. As we later point out in the text, the Legislature did not adopt this ''divisible'' theory of ownership but followed the opposite approach, specifically excluding as to sales taxation liability for most lease transactions. Mr. Keesling acknowledges this fact, but suggests that the ''divisible'' theory should nonetheless apply to subject the lessee to liability for a use tax. This proposal conflicts with the synchronized operation of California's sales and use tax system.

California.[7] Since the rental value is not the controlling factor, the actual length of the lease and the rental payments are immaterial. The tax impinges upon Cienega's purchase *for* California use. (Rev. & Tax. Code, § 6201.)

As we have explained, the use tax takes the place of the sales tax in order that retailers who sell products in California will not be placed at a disadvantage as compared to those who buy products for use in California. In the case of the sales tax we are not concerned with the buyer's disposition of the product. The purchaser of a car in California, for instance, may sell it the next day or may keep it for 10 years; in either event, he pays the sales tax upon the whole purchase price. In like fashion, the purchaser who buys the car outside of California for use in California by leasing it here pays his use tax upon the purchase price of the car.

These considerations, we believe, compel the conclusion that Cienega used, and exercised control over, the property in California, consumed it here, and is taxable upon the purchase price. Nor is this conclusion affected by Union's two opposing contentions that: (1) we should adopt the rationale of the Supreme Judicial Court of Maine in rejecting the taxation of a purchaser-lessor under similar use tax statutes, and (2) we should apply the "divisible property" theory which this court has recognized in imposing ad valorem taxation of real property leases.

Union urges, first, that we follow the decisions of the Supreme Judicial Court of Maine, the only other appellate jurisdiction which has adjudicated a similar issue. In two cases which construed the application of Maine's comparable statutes to an out-of-state lessor's purchase of tangible personal property for the lessee's physical operation within Maine, the court held that only the lessee's activity constituted a "use" within the state. (*Trimount Coin Machine Co.* v. *Johnson* (1956) 152 Me. 109 [124 A.2d 753]; *South Shoe Machine Co., Inc.* v. *Johnson* (1963) 159 Me. 74 [188 A.2d

---

[7]The tax is imposed when the evidence fairly demonstrates that the purchaser of the property contemplated a prompt and substantial employment of the property in California. The State Board of Equalization applies the "principal use" test and imposes the tax only if the item is used principally in this state during the initial year or six months following its purchase under circumstances which reveal that it was purchased for that purpose. (See Sales Tax Counsel Ruling of January 10, 1955, CCH State Tax Reporter, California, vol. 2, paragraph 60-180.723.)

353].) "The use and *possession* of the property in Maine in its entirety is, and at all times has been, in the lessee or customer by virtue of the lease." (*Trimount Coin Machine Co.* v. *Johnson, supra*, p. 755 [of 124 A.2d] ; italics added.)

As we have stated, *supra*, the concept of "use" as mere physical manipulation overlooks all the other attributes of ownership, including the incident of leasing; it is arbitrarily restrictive and academic. The Maine court has itself somewhat retreated from the rigid approach exemplified by these cases, holding in *Automatic Canteen Co. of America* v. *Johnson* (1963) 159 Me. 189 [190 A.2d 734], that if the lessor of automatic vending machines, which were used in the state, dispatched its employees into the state to check upon the machines, the "acts" of the lessor constituted sufficient use to justify the imposition of the use tax. In any event, the Maine Legislature revised its use tax statutes specifically to impose a use tax upon the rental of property within the state. (Me. Rev. Stats., ch. 17, § 4-B, added by P.L. 1961, ch. 58.)

Union, in an attempt to equate use with physical use, urges that we apply here the divisible theory of ownership, which determines the imposition of ad valorem taxes upon real property. As we shall show, however, the argument ignores the respective objectives of the use tax and the ad valorem tax.

The use tax "does not fall upon the owner because he is the *owner*, regardless of the use or disposition he may make of the property. It is imposed on certain of the *privileges* of ownership, but not on all of them." (*Douglas Aircraft Co., Inc.* v. *Johnson* (1939) 13 Cal.2d 545, 551 [90 P.2d 572] ; italics added.) The use tax frames an excise tax upon the privilege of utilizing property within this state in a certain manner. "A privilege tax . . . is imposed upon the right to exercise a privilege, and its payment is invariably made a condition precedent to the exercise of the privilege involved." (*Ingels* v. *Riley* (1936) 5 Cal.2d 154, 159 [53 P.2d 939, 103 A.L.R. 1].) The sales and use taxes encompass apposite privileges. "A sales tax is a tax on the freedom of purchase. . . . A use tax is a tax on the enjoyment of that which was purchased." (*McLeod* v. *J. E. Dilworth Co.* (1944) 322 U.S. 327, 330 [64 S.Ct. 1023, 88 L.Ed. 1304, 1307].)

The provisions of the Sales and Use Tax Law demonstrate that the Legislature did not adopt for those taxes the divided ownership theory. That theory conceives of the lease as a transfer of part of the "ownership" upon delivery

of the property. Hence during the term of the lease the lessor cannot be the owner of "tangible personal property" which he could "use." Yet the Revenue and Taxation Code, section 6006, as to the sales tax, rejects the divisible property theory, providing that bona fide lease transactions are *not* to be considered "sales." Section 6006, and section 6009 which defines use, comprise part of chapter 1 of the same statute and apply to the identical scheme of taxation. We cannot conceive that, despite the complementary composition of the taxes, the Legislature meant to enact the divided ownership theory for the use tax but not for the sales tax.

A different approach, expressing different basic legislative intendments, underlies the decisions in regard to the taxation of real property. Although privately held leasehold interests in publicly owned real property are subject to taxation, the public ownership interest is exempt (*Texas Co.* v. *County of Los Angeles* (1959) 52 Cal.2d 55 [338 P.2d 440]) ; the rental price, moreover, *is* considered the purchase price of the leasehold interest and, for purposes of appraisal by the capitalization of net income method, the rental is not deductible as an expense. (*DeLuz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546 [290 P.2d 544].)

In a similar fashion a school district's leasehold interest in privately owned real property gains exemption from taxation since the property is "used exclusively" for public school purposes. (*Ross* v. *City of Long Beach* (1944) 24 Cal.2d 258 [148 P.2d 649].) In *Ross* this court effectuated the divisible property concept in interpreting constitutional provisions which exempted two classes of property: (1) property *"used exclusively"* for specified public purposes, and (2) property *"belonging"* to a government body. In rejecting the argument that for purposes of property taxation the private owner in leasing his property "uses" it commercially and hence the property is not "used *exclusively*" for school purposes, we said, "To so construe the constitutional provision would tend to eliminate the main distinction between the two classes of property enumerated therein. In order to so construe this provision of the Constitution it would be necessary to insert therein the words 'which may belong to a school district' or words of similar import, so that the clause respecting property used for public school purposes would read 'property which may belong to a school district and used exclusively for public school purposes.' To insert these sug-

gested words into this section of the Constitution would give to it an added meaning not to be found in the definite language of the section as adopted by the people. . . .'' (*Ross* v. *City of Long Beach* (1944) 24 Cal.2d 258, 260 [148 P.2d 649].)

The requirement for a narrow construction of ''use'' in order to integrate it with the balance of the statute, as occurred in *Ross*, contrasts with the considerations here which call for the opposite result. The statutory scheme here induces a liberal interpretation of the word use in order to achieve consistency with the sales tax. Additionally, the rule in ad valorem tax legislation which recognizes the concept of separate taxation of possessory interests relates to real property (*General Dynamics Corp.* v. *County of Los Angeles* (1958) 51 Cal.2d 59, 65 [330 P.2d 794]) and even in that coverage pertains to a limited area.

Thus the sales and use tax statutes presently and consistently express in definition and design the indivisible ownership theory. To interpose by judicial fiat a contradictory concept in the administration of the use tax would be to create a breach in our comprehensive revenue system.

We now undertake an analysis of the second issue set forth above: whether Cienega purchased the vessels for the purpose of storage, use and consumption in California. We shall explain why we have concluded that the record supports the trial court's finding that the vessels ''were purchased for use and consumption in the State of California.''

This court has expressly held that products are purchased for use in California if at the time of sale, the lessor contemplated that the products would be used in this state. (*Chicago Bridge & Iron Co.* v. *Johnson* (1941) 19 Cal.2d 162 [119 P.2d 945].) While that use may have been only a matter of the anticipated probabilities at the time of the purchase, once the probabilities congeal into particular events constituting a ''use'' within the state, the transaction becomes taxable. (*Atchison etc. Ry. Co.* v. *State Board of Equalization* (1956) 139 Cal.App.2d 411 [294 P.2d 181]; *Flying Tiger Line, Inc.* v. *State Board of Equalization* (1958) 157 Cal.App.2d 85 [320 P.2d 552].) Other jurisdictions have reached a similar conclusion. (See *Morrison-Knudsen Co.* v. *State Tax Com.* (1950) 242 Iowa 33 [44 N.W.2d 449, 41 A.L.R.2d 523]; Note 41 A.L.R. 2d 535; *Western Contracting Corp.* v. *Iowa State Tax Com.* (1961) 253 Iowa 365 [112 N.W. 2d 326].) When the use contemplated by the lessor is, in fact, effectuated follow-

ing the transfer, the obligation matures; the duty of collecting the tax becomes the retailer's.

If the parties transfer title outside the state but the lessor entertains the expectation of California use, which is later fulfilled, the locus of the sale or delivery does not control the issue. Of course, the taxpayer may show as a matter of defense the payment of the California sales tax. "The use tax applies to property purchased for use in this state wherever purchased, unless the gross receipts from the sale have been included in the measure of the California sales tax (Rev. & Tax. Code, § 6401), or unless the transaction is otherwise exempted by the statute or by the state or federal Constitution." (*Flying Tiger Line, Inc.* v. *State Board of Equalization* (1958) 157 Cal.App.2d 85, 98 [320 P.2d 552].) Indeed, California enacted a use tax so that the taxability of property purchased for use in this state, and principally used thereafter in this state, should not turn upon the fortuity of whether or not title or physical delivery of the property passed within this state. (Traynor, *The California Use Tax* (1936) 24 Cal.L.Rev. 175.)

In this case both parties to the transaction, Union and Cienega, knew that the vessels had been employed principally in California intrastate commerce for a considerable period immediately prior to the transfer. The parties at the date of the transaction did not anticipate a change in operations; they entertained a contrary, if unexpressed, intention. Subsequent to the transfer the vessels were indeed used in the same manner as before; both before and after the transfer Union employed these vessels a minimum period of approximately 70 per cent of each year in intrastate activities. We do not suppose that Cienega, as the purchaser and lessor, would execute bareboat charters concerning two vessels valued at nearly $5,000,000 without some fairly reliable information as to the manner and locale of their subsequent employment. We find substance in the trial court's conclusion that Cienega must have contemplated that the ships would be returned to, and operated within, California.

Once this inference arises as to Cienega's expectation, the burden of rebuttal falls upon the plaintiff, Union, in California; yet Union has failed to meet that burden. (See *El Dorado Oil Works* v. *McColgan* (1950) 34 Cal.2d 731, 744 [215 P.2d 4]; *Pacific Fruit Express Co.* v. *McColgan* (1944) 67 Cal.App.2d 93, 96 [153 P.2d 607].) Union presented no affirmative evidence to rebut the inference that Cienega con-

templated that the vessels would be operated under the lease in California.

Yet Union, as both retail seller and lessee of the vessels, occupied a position of peculiar knowledge as to the information afforded Cienega as to the past and present use of the vessels. The record, however, contains neither evidence that the parties proposed to change the way the vessels were to be utilized nor that the vessels were not utilized in precisely the manner which was anticipated. In any event, Union, as the retailer, under California law becomes the state's involuntary tax collector and cannot, in this instance, complain that injustice to it accrues from its lack of knowledge of the known conditions which created its obligation to collect the tax.

Turning now to the third issue suggested, *supra*, we point out that California may properly impose upon Union the duty to collect this tax since Cienega's use of the property gained no exemption upon statutory grounds.

Although Union relies upon section 6368 of the Revenue and Taxation Code, which expressly exempts from sales or use taxation watercraft "for use in interstate or foreign commerce involving the transportation of property or persons for hire," this section does not apply here. As we shall explain, in the first place, the lessor did not use the vessels for transportation of property or persons "for hire"; in the second place, the lessor did not employ the vessels, themselves, primarily in interstate or foreign commerce.

Cienega leased the vessels to Union; Cienega did not arrange for the transportation of property for hire; the phrase "for hire" in the statute relates to the property or goods carried and not the vessel which hauls the goods. Union employed the vessels, moreover, principally in intrastate operations. By virtue of a formal ruling by the State Board of Equalization (Ruling 51.5, Cal.Admin. Code, tit. 18, § 1992) this exemption does not apply to the principal use of the vessels in intrastate operations.[8] The instant ruling embodies a reasonable interpretation of the statute; such

---

[8] "While this contemporaneous administrative construction is not necessarily controlling, it 'is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized.' (*Coca-Cola Co.* v. *State Board of Equalization*, 25 Cal.2d 918, 921 [156 P.2d 1].)'' (*Select Base Materials, Inc.* v. *State Board of Equalization* (1959) 51 Cal.2d 640, 647 [335 P.2d 672]; see also *Anders* v. *State Board of Equalization* (1947) 82 Cal.App.2d 88, 98 [185 P.2d 883].)

a valid classification will be followed by this court. (*General Electric Co.* v. *State Board of Equalization* (1952) 111 Cal. App.2d 180, 188 [244 P.2d 427].)

Our fourth and final issue involves the constitutionality of California's exaction of the tax. Because Cienega enjoyed the use of its tangible property in California, California may properly impose a tax upon that privilege. We have explained that Cienega, by means of leasing the vessels, used them in this state; the cases hold that California's taxation of that utilization of the property does not violate the due process clause of the Fourteenth Amendment.

The due process clause requires "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." (*Miller Bros. Co.* v. *Maryland* (1954) 347 U.S. 340, 344-345 [74 S.Ct. 535, 98 L.Ed. 744, 748].) The state's action will satisfy the constitutional test "if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." (*Wisconsin* v. *J. C. Penney Co.* (1940) 311 U.S. 435, 444 [61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229].)

The instant situation displays "the link": the use of the vessels impinged in California; California granted to them the benefits of an ordered society.

Not only may the state impose an ad valorem tax upon the nonresident owner for a chattel located in the taxing state; it may also levy upon such an owner a tax upon the profits of a sale of the property in the taxing state. Thus the decisions of *Coe* v. *Errol* (1886) 116 U.S. 517 [6 S.Ct. 475, 29 L.Ed. 715], and *Pullman's Palace Car Co.* v. *Pennsylvania* (1891) 141 U.S. 18 [11 S.Ct. 876, 35 L.Ed. 613], establish the constitutionality of such an ad valorem tax. The ruling in *New York* ex rel. *Whitney* v. *Graves* (1937) 299 U.S. 366, 369 [57 S.Ct. 237, 81 L.Ed. 285, 286], holds that the "profits realized by a non-resident upon the sale of a right appurtenant to membership in the New York Stock Exchange" could properly be taxed by New York. The state may thus tax the out-of-state owner, represented by Cienega here, for the earnings derived from property in the taxing state.

A decision of the Supreme Court of Mississippi, in which the United States Supreme Court dismissed an appeal and refused a hearing, passes upon the exact issue. In *Stone* v. *Stapling Machines Co.* (1954) 220 Miss. 470 [71 So.2d 205],

a foreign corporation rented its machines to Mississippi lessees in New Jersy for use in Mississippi: ". . . these machines were carried to Mississippi but they remained the property of the company." (P. 207 [71 So.2d].) The court found no violation of due process in the imposition of the state's sales tax upon the rental receipts. Since the California sales tax law does not include bona fide leases within the definition of "sale" (Rev. & Tax. Code, § 6006, subd. (a)) but holds the lessor to be the consumer of the property, the tax involved in the Mississippi case would have been labelled a use tax here. The nomenclature of the tax does not affect the principle of the holding of tax liability.

Finally, the cases cited by Union in negation of the state's constitutional power to tax do not exactly apply to the instant situation. Its reliance upon *Miller Bros. Co.* v. *Maryland, supra,* 347 U.S. 340, and *Scripto, Inc.* v. *Carson* (1959) 362 U.S. 207 [80 S.Ct. 619, 4 L.Ed.2d 660], overlooks the fact that both of those cases recognize the distinction between the out-of-state transaction which embodies the owner's outright sale of the property, severing his connection with it, and the owner's lease of the property for use in the taxing state. *Miller* involved cash sales to customers, some of whom bought for Delaware use, which Delaware sought to tax. Yet as the Supreme Court noted in *Scripto* ". . . it was impossible for Miller to determine that goods sold for cash to a customer over the counter at its store in Delaware were to be used and enjoyed in Maryland." (P. 212 [4 L.Ed.2d at pp. 664-665].)

In the instant case Cienega anticipated Union's use of the vessels in California. Our case more closely resembles *Scripto,* a situation in which Florida levied a tax upon the out-of-state seller "for the use and enjoyment of property which has been purchased by Florida residents." (P. 211 [4 L.Ed. 2d at p. 663].)

The imposition of the use tax, as we shall now explain, clearly does not unduly burden interstate commerce. We can no longer question the constitutionality of the complementary use tax as an undue burden upon interstate commerce as such; *Henneford* v. *Silas Mason Co.* (1936) 300 U.S. 577 [57 S.Ct. 524, 81 L.Ed. 814], settled the issue: "The tax is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end" (p. 582 [81 L.Ed. at p. 818]); "The tax upon the use after the property is at rest is not so measured or conditioned as to hamper the transactions of interstate commerce or discriminate against them." (P. 583 [81 L.Ed. at p. 819].)

Thus, so long as an appropriate "taxable interval" of intrastate enjoyment intervenes, the indirect effect upon interstate commerce does not affect the constitutionality of the tax. (*Southern Pacific Co.* v. *Gallagher* (1939) 306 U.S. 167 [59 S.Ct. 389, 83 L.Ed. 586] ; *Pacific Tel. & Tel. Co.* v. *Gallagher* (1939) 306 U.S. 182 [59 S.Ct. 396, 83 L.Ed. 595].) Since in the instant case Union operated the two vessels in intrastate commerce in this state, the taxable interval occurred.

Nor does the use tax violate the inhibition of *General Trading Co.* v. *State Tax Commission of Iowa* (1944) 322 U.S. 335, 338 [64 S.Ct. 1028, 88 L.Ed. 1309, 1312], that "[T]he mere fact that property ... has come into an owner's possession as a result of interstate commerce does not diminish the protection which he may draw from a State to the upkeep of which he may be asked to bear his fair share. But a fair share precludes legislation obviously hostile or practically discriminatory toward interstate commerce." California levies its use tax with respect to property stored, used or consumed in this state at rates uniform with those imposed upon retail sales by the sales tax; it does not discriminate against interstate commerce but protects local retailers from the discriminatory advantage which out-of-state competitors would otherwise enjoy. We see no constitutional violations in California's imposition of its use tax in this instance.

As to the transaction itself, we cannot, in the face of a showing that the parties contemplated the use of the property under the lease in California, apply the balm of tax immunity. The contract, consummated outside the state, provided theoretically for the use of the vessels in all states, but the formality of the phrase cannot block out the reality of the transaction. The facts of the arrangement demonstrate that the parties anticipated the use of the property in California; subsequent history confirms that use. If we hold that in these circumstances the technique of the extraterritorial sale and leaseback transaction wins use-tax immunity, we invite a wholesale emigration of parties to other states for the consummation of such tax-saving contracts.

The judgment of the trial court is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., and Peek, J., concurred.

McCOMB, J.—I dissent. I would reverse the judgment for the reasons expressed by Mr. Justice Van Dyke in the opin-

ion prepared by him for the District Court of Appeal in *Union Oil Co. v. State Board of Equalization* (Cal.App.) 28 Cal.Rptr. 58.