STONE, CHAIRMAN, ETC., *v.* STAPLING MACHINES CO.

March 22, 1954

No. 38949 58 Adv. S. 47 71 So. 2d 205

*John E. Stone,* Asst. Atty. Gen., Jackson, for appellant.

*J. H. Sumrall,* Jackson, for appellant.

*Tighe & Barksdale,* Jackson, for appellee.

Lee, J.

A. H. Stone, Sales Tax Commissioner, made demand, under Section 10111, Code of 1942, upon Stapling Machines Company for the payment of a sales tax of two per cent on the gross income of its business for a two-year period. It amounted to $4,713.33 for 1949 and $7,017.09 for 1950, or a total of $11,730.42. The company protested the assessment. After a full hearing

before the State Tax Commission, it was affirmed. The tax was then paid, and subsequently, the Company filed its suit in the Circuit Court of Hinds County to recover the amount paid. The circuit judge, sitting as both judge and jury, found for the plaintiff, and from the judgment entered, the Tax Commissioner appealed.

The material part of Section 10111, supra, is as follows: ''(1) Upon every person engaging or continuing within this state in any of the following businesses, there is likewise hereby levied and shall be collected a tax on account of the business engaged in equal to two per cent of the gross income of the business: * * * Renting or leasing of tangible personal property * * *.''

The appellant contends that the tax here collected was two per cent of the gross income of appellee from its business of renting or leasing tangible personal property in the state. On the contrary, the appellee contends that the income in question did not arise from rents, but was royalty, and, as such, was not taxable. The decision of this controversy also involves a consideration of what constitutes doing business, the situs of property for taxation, and the commerce clause of the federal constitution.

The appellee is a Delaware corporation, having a place of business in Rockaway, N. J. It leased, under a written contract, to certain persons in the State of Mississippi, delivered f.o.b. the place of manufacture, at the cost of production, certain box making machines on which it held U. S. patents. The lessees thereunder acquired no property rights other than the right to use. The company agreed to furnish repair parts. Its agents were granted access to the machines for inspection and sketching. It had no office or agent in the state. The obligations of the lessees were payable at its principal place of business; and the lessees were required to keep accurate records, separate and apart, and subject to examination by the company's agents who had the right to make copies. The lessees were also required to

report in writing to the company the number of boxes delivered during the past month, to whom sold, and the gross amount thereof.

Under Section 1 of the lease contract, the lessee had "the right and license (a) to make on Lessor's machines in the factory of Lessee at .............................. boxes covered by any one or more of the patents listed in Exhibit A; (b) to use in said factory, for the manufacture of boxes, machines leased hereunder from Lessor; (c) to use in said factory, for the manufacture of boxes on Lessor's machines, the method inventions covered by any one or more of said patents; and (d) to sell in the United States boxes made under this agreement."

Thus it will be seen that the lessees had the right to use the patented machines, to make patented boxes thereon, to use the method inventions covered by the patents, and to sell the boxes in the United States.

The applicable part of Section 3 of the lease contract, now under consideration, is as follows: "Lessee agrees to pay to Lessor, in addition to the amounts hereinbefore provided to be paid by Lessee for the initial right to possess the machines leased hereunder, (a) sums of money equal to four per cent *(4%) of the gross sales* or fair market value, whichever is higher, *of all "Rock Fastener', 'All-Bound', and 'James' boxes* made under this agreement, and (b) sums of money equal to two per cent *(2%) of the gross sales* or fair market value, whichever is higher, *of all other boxes* made under this agreement; *and Lessee agrees to pay such sums as a royalty for the use of any or all of the patented inventions hereunder licensed to be used and/or as a rental for the use of any or all machines leased hereunder;* * * *"*. (Emphasis Supplied).

Under the above provision, lessees had to pay the cost of production of the machines, four per cent of the gross sales of the patented boxes, and two per cent of the gross sales of all other boxes.

 It is clear that the company rented its machines to the lessees in New Jersey with the understanding that they would be operated in Mississippi. Pursuant thereto, these machines were carried to Mississippi, but they remained the property of the company. The lessees were required to pay two per cent of the value of any box made on one of the machines. Clearly such two per cent was an additional rental for the use of the patented machines. But, since four per cent of the value had to be paid, if a patented box was made on the machines, in reason it follows that the difference between four per cent on the patented boxes and two per cent on any other box, that is, two per cent constituted royalty, that is, compensation for the use of the patent.

Notice the very significant language in Section 3 of the lease contract: "* * * and Lessee agrees to pay such sums as a royalty for the use of any or all of the patented inventions hereunder licensed to be used and/or as a rental for the use of any or all machines leased hereunder; * * *." Those words provide for the payment of both royalty and rental. The above conclusion, therefore, seems inescapable.

 In such view 69 C. J. S., Patents, Section 258a, page 792, becomes helpful. It is as follows: "*The word 'royalty', when used in connection with a license under a patent, means the compensation paid by the licensee to the licensor for the use of the licensor's patented invention.* It has been defined as a tax or duty paid to the owner of a patent for the privilege of manufacturing or using this patented article; rental; payment proportionate to the use of the patented device; something proportionate to the use of a patented device, or, in other words, a kind of excise; specific sums paid annually, or at other stated period, for the right to use a patented device, whether it is used much or little or not at all. The word has been held an appropriate term as applied to improvements which are nonpatentable.

■■■ "*The word 'rental' used with reference to pat-
ented devices has been said ordinarily to mean specific
sums paid annually or at other stated periods for the right
to use a patented device; and in this connection it has
been distinguished from 'royalties'.*" (Emphasis sup-
plied). Western Union Tel. Co. v. American Bell Tel.
Co., (Mass.) 125 Fed. 342, 60 CCA 220, is cited. See
Hubenthal v. Kennedy, 76 Iowa 707, 39 N. W. 694; Volk
v. Volk Manufacturing Co., 101 Conn. 594, 126 Atl. 8847.

■■■ This Court has said that rent is compensation for
the use of property. Hines Motor Co., Inc. v. Hederman,
201 Miss. 859, 30 So. 2d 70; Stovall v. Gardner, 203
Miss. 527, 36 So. 2d 163.

Paragraph (12) Section 10104, Code of 1942, provides
that the term "business", when used in the Act, "shall
include all activities or acts engaged in (personal or
corporate) or caused to be engaged in with the object
of gain, benefit or advantage either direct or indirect,
and not exempting subactivities producing marketable
commodities used or consumed in the main business ac-
tivity each of such subactivities shall be considered busi-
ness engaged in, taxable in the class in which it falls."

In Kantor & Son v. Stone, 203 Miss. 260, 34 So. 2d
492, the appellants contended that they were engaged in
the business of a general contractor, for which they had
paid all taxes due, although as an incident thereto and
as a business expediency, they made the ten sales of
tangible property there in question. The Court held
that the tax, which was imposed by Section 10108, Code
of 1942, was due by reason of the "business" which
was defined in Section 10104 thereof. The opinion said:
"It requires no argument to demonstrate that by buying
and selling this real property the appellants were en-
gaged in business under this statute, but they say that
this was not their main business but was only incidental
thereto. The mere fact that one business is an incident
of another does not relieve it from taxation under this
statute, it may nor may not, depending upon its character

and purpose. A person may be engaged in more than one business, each of which is taxable under this statute."

In Stone v. General Contract Purchase Corp., 193 Miss. 301, 7 So. 2d 806, where a Missouri corporation, with an office in Memphis, Tennessee, acquired, from automobile dealers, notes which were secured by liens on automobiles, and the corporation's agents came into the state to collect the notes and enforce liens, it was held that the corporation was "doing business" in the state so as to require it to pay the state privilege tax imposed by Chapter 110, Laws of 1940. In answer to the contention that the corporation did no business in the state as to such notes, the opinion said: "Acquiring these notes was one of the things necessary to be done in the prosecution of the appellee's business, but it was not the only one, for they must either be sold or collected, and when necessary the liens securing their payment must be enforced. All of the things necessary for the prosecution of a business need not take place within the state imposing a privilege tax thereon before the tax can be exacted. All that is necessary is that something be done to take place within the taxing state that is incident to or substantially connected with the prosecution of the business. State of Wisconsin v. J. C. Penney Co., 311 U. S. 435, 61 S. Ct. 246, 85 L. Ed. 267, 130 A. L. R. 1229. Neither the common law definition of what constitutes doing business nor that of former decisions of this court control here, for the legislature, as it had the right to do (Mathison v. Brister, 166 Miss. 67, 145 So. 358; 59 C. J. 1036), has set forth in the statute what is meant by the words 'doing business' and 'doing a business' * * *."

In other words, the statute defined "doing business", the corporation operated within that definition, and it was liable for the tax. It was pointed out that the liens were protected by the laws of the State, without which they would be of little value, and that the tax was exacted in return for something substantial, which the State had

given. On this point, the opinion cited State of Wisconsin v. J. C. Penny Co., supra. The proof in the case before us did not show that the Stapling Machines Company had ever sent any of its agents into the state in connection with these machines, but it had the right of access to inspect and sketch them. Besides, by another provision of the contract, it was stated: "Lessee agrees that it will not (a) encumber, sub-let, or sub-license any machine leased under this agreement; (b) allow any such machine to be removed from its possession either upon any writ of attachment or in satisfaction of any execution, judgment, or decree, or on distraint for rent; or (c) allow any other person or party to use any such machine."

The terms of the contract can be enforced under the laws of this State. A violation thereof can make the lessees amenable to the process of the state courts. Hence the tax is imposed in return for protection by the state. See Pergl v. U. S. Axle Co., 50 N. E. 2d 115; Village of Axtell v. Nebraska Hardware Municipal Ins. Co., 7 N. W. 2d 471; Cincinnati, Ohio v. Commonwealth, ex rel., 292 Ky. 597, 167 S. W. 2d 709.

But, if the appellee is not liable for this tax, it will pay nothing at all for this protection, because under its contract, the lessees pay the ad valorem taxes on the machines.

The machines were located in the state, and under the philosophy announced in Stone v. General Contract Purchase Corp., supra, the State may collect this tax. See also International Harvester Co. v. Wisconsin Dept., of Taxation, 322 U. S. 435, 88 L. Ed. 1373, where it was said: "A state may tax such part of the income of a non-resident as is fairly attributable either to property located in the state or to events or transactions which, occurring there, are subject to state regulation and which are within the protection of the state and entitled to the numerous other benefits which it confers."

■■■ The machines have obtained a business situs apart from the domicile of their owner, as they may do. In New York, ex rel. v. Graves, 299 U. S. 366, 81 L. Ed. 285, there was involved the constitutionality of a tax imposed by the State of New York upon profits realized by a non-resident upon the sale of a membership in the New York Stock Exchange. It was argued that the membership was intangible personal property, that property of that sort is taxable only at the domicile of the owner, and that unless the membership had a "business situs" in New York, it was not taxable there. In answer to this argument, the Court said: "When we speak of a 'business situs' of intangible property in the taxing State we are indulging in a metaphor. We express the idea of localization by virtue of the attributes of the intangible right in relation to the conduct of affairs at a particular place. The right may grow out of the actual transactions of a localized business *or the right may be identified with a particular place because the exercise of the right is fixed exclusively or dominantly at that place. In the latter case the localization for the purpose of transacting business may constitute a business situs quite as clearly as the conduct of the business itself.*" (Emphasis supplied).

■■■ Where the situs of the intangibles is confined to the domicile of the owner, they are of course taxed at his domicile. "But when the taxpayer extends his activities with respect to his intangibles, so as to avail himself of the protection and benefit of the laws of another state, in such a way as to bring his person or property within the reach of the tax gatherer there, the reason for a single place of taxation no longer obtains, and the rule is not even a workable substitute for the reasons which may exist in any particular case to support the constitutional power of each state concerned to tax." Curry v. McCanless, 307 U. S. 357, 83 L. Ed. 1339. See also Kelly v. Bastedo, 70 Ariz. 371, 220 P. 2d 1069; State v. Atlantic

Oil Producing Co., 49 P. 2d 534; Grieves v. State, ex rel, 35 P. 2d 454.

██ When the machines came to rest in this state for the purpose of manufacturing patented and unpatented boxes, the use or rent thereof became localized, and they left the stream of interstate commerce. In McGoldrick v. Berwind-White Coal Min. Co., 309 U. S. 33, 84 L. Ed. 565, the Court said: ██ "But it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business, Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 254, 82 L. Ed. 823, 826, 58 S. Ct. 546, 115 A. L. R. 944. Not all state taxation is to be condemned because, in some manner, it has an effect upon commerce between the states, and there are many forms of tax whose burdens, when distributed through the play of economic forces, affect interstate commerce, which nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress."

Spector Motor Service, Inc. v. O'Connor, Tax Com., 340 U. S. 602, 95 L. Ed. 573, under the construction now being made, is not in point because the tax there levied was directly on the right to engage in interstate commerce, inasmuch as the goods were still in the stream of such commerce, when they reached the docks of the bus company.

Likewise, Coleman, Attorney General v. Trunkline Gas Co. (Miss.) 63 So. 2d 73, is not in point, because there a special privilege tax was levied upon gas pipeline companies, which were engaged solely in interstate operations, and for that reason, it was held that the tax there levied was a violation of the commerce clause of the federal constitution.

The efficacy of Houston Canning Co. v. Virginia Can. Co., 211 Ala. 232, 100 So. 104, strongly relied on by the appellee, is somewhat impaired by a subsequent decision

of that Court in Cadden-Allen v. Trans-Lux News Sign Corp., 48 So. 2d 428, wherein the court commented that "the decision in that case is on the borderline and is of doubtful soundness."

██ The order of the State Tax Commission, which made the assessments final, recites that it was made after "an exhaustive and diligent examination of all available information." It adjudicated and determined that the income from one-half of the four per cent paid by the lessees was royalty for manufacturing patented boxes and was not taxable; but that the other half was for rent and was taxable; and that all of the income from the two per cent charge for making unpatented boxes was rental, and was taxable. The basis for the assessments was sound in fact, and was in no way arbitrary or discriminatory.

It follows that the learned trial court was in error in awarding a judgment for the appellee, and the cause is, therefore, reversed, and a judgment will be entered here for the appellant.

Reversed and judgment here.

All justices concur.