418 So.2d 652 (1982)
Shirley McNAMARA, Secretary of the Department of Revenue and Taxation, State of Louisiana
v.
The ELECTRODE CORPORATION.
No. 14850.
Court of Appeal of Louisiana, First Circuit.
May 25, 1982.
Rehearing Denied July 13, 1982.
Writ Denied October 8, 1982.
*654 Howard M. Romaine, Edwin M. Callaway, Riley F. Boudreaux, Jr., Baton Rouge, for plaintiff-appellant Shirley McNamara, Secretary of the Dept. of Revenue and Taxation, State of Louisiana.
G. William Jarman, R. Gordon Kean, Jr., Baton Rouge, for defendant-appellant The Electrode Corp.
Before LEAR, CARTER and LANIER, JJ.
CARTER, Judge.
Shirley McNamara, the Secretary of the Department of Revenue and Taxation (Department), and the Electrode Corporation (Electrode) both appealed the trial court's judgment in favor of the Department and against Electrode in the sum of $483,241.28 for lease/rental and sales/use taxes due the Department for the period of January 1, 1971 through December 31, 1974[1], the sum of $120,810.32 as penalties on the amount of taxes owed, the sum of $18,900.00 for occupational license taxes due the Department for the period January 1, 1971 through December 31, 1975, and, statutory interest on each tax from the date it was due.

FACTS
Electrode, a wholly owned subsidiary of Diamond Shamrock Corporation, is a foreign corporation with its principal office in Chardon, Ohio. Electrode has no office or established place of business in the State of Louisiana. It does several million dollars of business each year with industries in Louisiana, has highly technical equipment (dimensionally stable anodes) leased to plants located in Louisiana, and habitually, on a regular basis, sends technical personnel into the state in connection with the installation, maintenance, etc. of its equipment.
During the tax years in question[2], Electrode leased to five chlorine/caustic soda *655 producing industries located in Louisiana, "dimensionally stable anodes" (anodes) which were installed in large chlorine/caustic soda producing units called cells. The contracts with three of the industries, Hooker Chemical Company, Kaiser Aluminum Company and PPG Industries, Inc., were each labeled "Anodes Lease Agreement". The contracts with BASF Wyandotte Corporation and Stauffer Chemical Company, in addition to the "Anode Lease Agreement", were each labeled "Technology and Patent License Agreement." According to the terms of the various agreements, the chlorine anodes never became the property of the Louisiana chlorine plants and always remained the "personal property of Electrode".[3]
During a routine audit of Stauffer Chemical Company for sales/use tax, an agent for the Department "picked up the lease of anodes" from Electrode to Stauffer. When Electrode was contacted by the Department, it informed the agent of the Department that Electrode was not doing business in the State of Louisiana. An agent of the Department traveled to Cleveland, Ohio, but Electrode officials refused to let the agent look at their records. At this time, a waiver of prescription for the prescribing years was obtained and the audit postponed for six months. Finally, the audit was effected, although the agent was not permitted to visit the location of Electrode Corporation and was required to work in the Diamond Shamrock Corporation offices. Invoices were brought to the agent during his examination, and he "picked up" those items he considered to be taxable. Electrode again argued that they owed no taxes. The agent was allowed to look at some of the various contracts and allowed to copy some of the wording, but was refused a copy of the contracts.
After the audit was concluded by the Department, a proposed assessment was effected of sales/use and lease/rental taxes for the tax period January 1, 1971 through December 31, 1974, in the amount of $603,357.69, with interest of $151,571.57 and penalties of $150,839.50, for a total of $905,768.76. Additionally, the Department proposed an assessment of $18,900.00 for occupational license taxes for the years 1971-1975 with interest of $4,725.00 and penalties of $4,279.50, for a total of $27,904.50.
Electrode formally protested each of the proposed assessments and never filed a Louisiana tax return for the alleged taxes due. On December 22, 1976, the Department, without administrative review, filed suit via ordinaria for collection of the sales/use tax, lease/rental tax, and occupational license tax.
The trial court first rendered judgment with written reasons in favor of the Department and against Electrode for the sum of $603,357.69 for lease/rental and sales/use tax for the period January 1, 1971 through December 31, 1974 and the sum of $18,900.00 for occupational license tax for the period January 1, 1971 through December 31, 1975. The trial court further assessed the defendant with statutory interest and penalties on each of the said sums as "provided by law from the date said taxes were due" without specifically setting forth the amount of the statutory interest and penalties.
A new trial was subsequently granted limited to a reconsideration of the taxability of the amounts received by Electrode under its contracts labeled "Technology and Patent License Agreement" and the question of whether interest and penalties were due on the taxes. On rehearing, the trial court partially reversed itself holding that *656 no taxes were due on the amounts received by Electrode under contracts labeled "Technology and Patent License Agreement".

ASSIGNMENTS OF ERRORELECTRODE
Electrode contends that the trial judge erred as follows:
1) By classifying the "dimensionally stable anodes" manufactured by Electrode and leased to various industries in Louisiana as movables, and, that in fact, the anodes should have been classified as immovables and not subject to the sales/use or lease/rental tax;
2) In the alternative, that even though the trial court disallowed recovery by the Department for the proceeds Electrode received from its "Technology and Patent License Agreements" with Stauffer Chemical Company and BASF Wyandotte, it erred in failing to allow a 68%/32% breakdown of nontaxable-taxable proceeds in the lease contracts with the three industries which did not contain a separate "Technology and Patent License Agreement."
3) In finding Electrode subject to the occupational license tax.
4) In assessing penalties and interest against Electrode.

ASSIGNMENT OF ERRORDEPARTMENT
The Department contends that the trial court erred in finding that the proceeds that Electrode received from its "Technology and Patent License Agreement" with Stauffer Chemical and BASF Wyandotte were not subject to a lease tax.
La.R.S. 47:301, et seq., imposed a sales/use and lease/rental tax only upon tangible personal property. Exxon Corp. v. Traigle, 353 So.2d 314 (La.App. 1st Cir. 1977) held that "tangible personal property" as used in the sales/use and lease/rental tax statute, La.R.S. 47:301, et seq., is synonymous for corporeal movable property as defined in the La.Civil Code. Therefore, the classification of an article of property as "immovable" effectively removes the item from the sales/use and lease/rental tax provisions of La.R.S. 47:301, et seq. Simply stated, if the anodes that are the subject of the lease agreements, are tangible personal property (corporeal movable property) then Electrode owes the sales/use and lease/rental tax; if the anodes are immovable property, either immovable by nature or immovable by destination, they are not subject to these taxes.
It is significant to note that subsequent to the tax periods in contest in this litigation (1971-1974), Section II, Title 1 of Book II of the La. Revised Civil Code, Treating of Immovable, was extensively amended by Act 728, Section 1. Set forth in Appendix I of this opinion are the Civil Code articles in effect for the period of the litigation and the amended versions as set forth by Act 728, Section 1 of 1978, which are the law today.
Electrode strenuously contends that the anodes, when installed in the chlorine/caustic cell, become immovable, either by nature as "component parts" of an immovable (the cell) under former Civil Code art. 464, or immovable by destination under former Civil Code art. 468. The Department contends that the anodes are "tangible personal property" (corporeal movables), and the Louisiana sales/use tax is appropriate on the anode as it enters this state, and that the lease/rental tax is due on the royalty payments that occur thereafter.
The anodes are brought by Electrode into the State of Louisiana for incorporation in the Louisiana chlorine producing plants. The anodes are housed in two types of cells, "diaphragm" and "mercury", with a typical diaphragm cell being from five feet wide, four to ten feet tall and five to ten feet long. The diaphragm cell consists of a cathode portion owned by Electrode and leased to the local industry. Although the mercury cells perform essentially the same function as diaphragm cells, they are based on different operational technology. The cathode, instead of being a metal structure, is a flowing bed of mercury.
*657 Diaphragm cells rest on four concrete pillars which are grounded in the concrete slab. Each cell is permanently attached to a large metal plate, and the large plates are interconnected with small curved metal plates secured by bolts. Mercury cells are bolted to a permanent metal frame embedded in the concrete and suspended over the floor of the cell room. The cells are owned by the local industries and not by Electrode. Once the local industry has completed the basic cell, they then obtain the anodes from Electrode. Chlorine/caustic manufacturing cannot take place without the completed cell which includes the anode bolted in place. It takes about fifteen minutes to install an anode in a diaphragm cell and an hour to install an anode in a mercury cell.

IMMOVABLE BY NATURE[4]
Immovables by nature were formerly defined in La.Civ.Code art. 464 before the 1978 revision as follows:
"Land and buildings or other constructions, whether they have their foundations in the soil or not, are immovable by their nature."
It is not disputed that the hundreds of cells located in the cell room and connected to each other and to the entire plant through a permanent pipe-in system, are immovable by nature being "other constructions" within the context of La.Civ.Code art. 464. These cells have their foundations in the concrete pillars sitting on a concrete slab. However, the question is whether the anodes which are bolted into the cells are immovables by nature by falling within the "other constructions" hereinabove referred to. Electrode contends that the anodes are "component parts" of the cell and the cell room structure and that the cell is certainly "damaged and rendered useless when the anodes are removed." We disagree.
In Benoit v. Acadia Fuel and Oil Distributors, Inc., 315 So.2d 842 (La.App. 3rd Cir.) it was stated:
"Immovability by nature has been characterized as a creation of the law based on practical considerations and on inherent characteristics of the things concerned. What is a building or other construction qualifying as an immovable under Article 464 is left for judicial determination according to prevailing notions and society. Bailey v. Kruithoff, 280 So.2d 262 (La.App. 2nd Cir. 1973); Yiannopoulos, Louisiana Civil Law Treatise, Vol. 2, Property, Sections 42, 45, 48 ...."
"Three criteria that are often mentioned in decisions by our courts, when faced with the question of what is an `other construction' within the meaning of Article 464, and therefore immovable by nature, are (1) size of the structure, (2) a certain degree of integration of attachment to the soil, and (3) some degree of permanency. Bailey v. Kruithoff, supra. See also Yiannopoulos, `Railroad Tracks as Immovables by Nature, Ruminations on American Creosote Company v. Springer', 19 La.Bar J. 37, 40 (June, 1971.)"
The anodes in the instant case do not meet any of the above criteria. The anodes are of small size and mobile enough to be removed in fifteen minutes to an hour, depending upon the type of cell to which they are affixed to. The speed and simplicity with which they can be unbolted and removed is comparable to that of the air compressor in the Benoit case, supra. Further, it is clear that the anodes, according to the terms of the lease, are contemplated to be periodically replaced by lessor and changed when damaged or in need of repair, and of course, finally removed at the end of the lease, again indicating that they are not a permanent part of the chlorine cell. Thus, they clearly do not meet the "size, integration and permanency" test required for classification as immovable by nature under art. 464. Further, the anodes are not indispensable to complete the building of cells, but only serve for industrial or commercial purposes and are easily removed without damage to themselves or to the "other constructions" to which they are *658 attached. In addition, each of the lease contracts clearly provides that it was the intention of the lessor and lessee that the anodes remain the "personal property of lessor."
Electrode, in support of its position, cites Swoop v. St. Martin, 110 La. 237, 34 So. 426 (1903); Milliken and Farwell v. Roger, 138 La. 823, 70 So. 848 (1916); and, Industrial Outdoor Displays v. Reuter, 162 So.2d 160 (La.App. 4th Cir. 1964), writ refused, 246 La. 348, 164 So.2d 352.
These cases are clearly distinguishable from the instant one. In Swoop, supra, the plaintiff was claiming an unrecorded vendor's privilege on new shells installed on defendant's sugar-mill roller, two housings for the rollers, four cast iron quarter boxes, two top journal boxes, four king bolts, three crown wheels, one turnage bar, two shafts, one spidor, a large sprocket wheel and a large number of small and less expensive items. A mortgage creditor of defendant, whose mortgage accrued after the sugar mill had been refitted, intervened denying that the plaintiff had a vendor's privilege on the items installed.
The sole issue was whether these installed items became so incorporated into the sugar mill so as to lose their identity as movables and became immovables by nature. The plaintiff repaired the sugar mill of defendant, furnished what pieces were needed, and these items were made especially to fit with the old pieces of the mill. All items furnished to the defendant, if separated from the mill, would have been nothing but scrap iron. Under these circumstances, the court held that the items lost their identity as separate movables and became incorporated into the sugar mill. The court further stated that of primary concern is determining whether the items lost their identity, and that this is a question of fact.
Clearly, in the instant case, the anodes are easily removable, never lose their identity, and although essential for the making of chlorine/caustic soda, are relatively standard items, retaining their economic utility beyond any specific installation.
In Milliken, supra, a seizure of a plantation was effected and one party was claiming an unrecorded vendor's privilege upon certain parts of machinery that had previously been sold by him to the plantation owner. The items sold were "one set of housing stands, one set of stands for crusher, one gear for crusher spur, and one shaft and coupling for crusher." The issue again was whether these items became incorporated into the machinery of the factory on the plantationmerged into itso as to become parts of it, or whether they retained their independent character.
The court stated that the parts could not be separated without injury to the rest of the machinery, and in effect, if removed, they would be merely scrap iron. The court went on to state that the items had been sold the year before for $715.00 and only brought at the sheriff's sale the sum of $200.00, noting that they had lost their character as things of commerce.
Clearly, in the instant case, the anodes can be separated without injury to the cells and the rest of the immovables of the local industries (even though the chlorine/caustic soda would not then be produced), and certainly the anodes retain their economic utility once removed and do not lose their character as items of commerce.
In the Reuter case, supra, plaintiff's sign company had rented the roof of a building from a previous owner (the defendants' predecessor in title) for the purpose of erecting an advertising sign. Two back-to-back signs were erected, but the lease was never recorded. The defendants, as owners of the immovable property, claimed ownership of the entire sign structure. The signs were affixed to "H" beams which were embedded in six to ten feet of concrete which went from the ground through the roof, but were not structurally part of the roof. The court stated that the entire sign structure fell within the category of "other construction" under Article 464 of the Louisiana Civil Code, since it was firmly embedded in the ground and was as permanent a construction as could be made of steel and concrete. The court held that the owner of *659 the land was the owner of the entire sign structure as a result of the purchase of the land upon which it was situated.
The factual situation presented in the instant case is clearly distinguishable from Reuter because the anodes are easily replaceable and clearly do not meet the "size, integration and permanency" tests which our jurisprudence has used as criteria for determining whether an "other construction" can be classified as an immovable by nature under article 464.[5]
It is apparent that chlorine/caustic soda cannot be produced without the anodes. However, the speed and simplicity with which the anodes can be unbolted and removed is certainly more comparable to that of the situation in Benoit, supra, than the situation presented in Reuter, supra. Although an integral part of the cell, in that a chlorine/caustic soda can not be produced without the anode, it is clear that the anode is not a permanent part of the cell. Summarizing, it is abundantly clear that the anodes in question are not immovable by nature, but are corporeal movables.
The trial judge correctly found that the anodes cannot be immovable by nature under any circumstances and correctly found the concept of immobilization by nature contemplates a merger or incorporation of the movable into the immovable so as to become an integral part of the immovable. When this occurs, the movable loses its identity, individuality, and commercial ability to become part of the immovable it serves. That is obviously not the case with these anodes.

IMMOVABLE BY DESTINATION[6]
La.Civ.Code art. 468 (prior to its amendment in 1978, and the law in effect at the time of this instant litigation) provides as follows:
"Art. 468 Things which the owner of a tract of land[7] has placed upon it for its service and improvement are immovable by destination.
Thus, the following things are immovable by destination when they have been placed by the owner for the service and improvement of a tract of land, to wit:
Cattle intended for cultivation.
Implements of husbandry.
Seeds, plants, fodder and manure.
Pigeons in a pigeon house.
Beehives.
Mills, kettles, alembics, vats, and other machinery made use of in carrying on plantation works.
The utensils necessary for working cotton, and sawmills, taffia distilleries, sugar refineries and other manufactures.
All such movables as the owner[8] has attached permanently to the tenement or to the building, are likewise immovable by destination."
Electrode strenuously contends that the Civil Code articles defining immovable by destination also clearly make the anodes immovable property not subject to the Louisiana sales/use and lease/rental tax. From the clear language of the codal article, it is apparent that Electrode's argument is without merit. Civil Code article 468 requires unity of ownership of the land and the movable placed thereon for the movable to become an immovable by destination.
Counsel for Electrode ingeniously argues that since the cells in which anodes are component parts are immovable by destination, unity of ownership is not required and the anode becomes immovable by destination. Electrode contends that since the local industry owns the cell there is nothing under article 468 to prevent the entire cell with the anodes contained in it from becoming immovable by destination. Electrode is confusing immovable by nature with immovable by destination which will be apparent in the discussion of the American Creosote case, infra.
*660 Electrode cites American Creosote Company v. Springer, 257 La. 116, 241 So.2d 510 (1970) in support of its position. American Creosote, as a subrogee to Illinois Central Railroad Company, filed suit against the defendant Springer for the value of certain trackage sold by Springer from a parcel of ground he acquired from American Creosote. Previously Illinois Central Railroad Company had leased to American Creosote's predecessor certain trackage laid by the railroad company across a certain portion of land belonging to American Creosote. Under the terms of the lease agreement, the railroad company remained the owner of the trackage which American Creosote was obligated to return at the conclusion of the lease. American Creosote sold the property to defendant Springer and the question before the court was whether Springer acquired the tracks as immovables by nature. The court held that a transfer of land included a transfer of the tracks and that the tracks were immovable by nature. The court further stated that the tracks formed an economic unity with the ground and were not susceptible to separate real rights. It further stated that the law does not encourage separate ownership of the ground and its component parts. The court said:
"Rationally a railroad track must be regarded as a `construction' under Article 464 of the Civil Code; it is so regarded in France under the corresponding article of the Napoleonic Code. See Comment, 8 Tul.L.Rev. 280 (1933). Thus, as we view the petition, this `trackage' or railroad is firmly incorporated into the ground and must be regarded as an immovable by nature-a component part of the land-insofar as Springer was concerned when he acquired the land upon which it was constructed. See Yiannopoulos, supra."
Since the court was dealing with an immovable by nature, unity of ownership was not required and Springer acquired the land free of any claim the railroad company had to any construction thereof which had become immovable by nature. As previously discussed, we have held that the anodes are not immovable by nature. An immovable by destination could only exist under former article 468 of the Civil Code when there existed unity of ownership. See Telerent Leasing Corporation v. R & P Motels, Inc., 343 So.2d 267 (La.App. 1st Cir. 1977). As in Telerent, supra, the anodes in the instant case are easily removable, retain their integrity, and are not immovable by nature and could not be, under the law then in existence (La.Civ.Code art. 468), immovable by destination.

TAXABILITY OF PROCEEDS
The Department contends that the trial court erred in finding that the proceeds that Electrode received from its "Technology and Patent License Agreement" with Stauffer Chemical Company and BASF Wyandotte were not subject to lease tax. Electrode contends that the trial court erred in not holding as exempt from tax, 68% of the proceeds received from the lease contracts with Hooker Chemical Company, Kaiser Aluminum Company and PPG Industries, Inc., the latter not having separate "Technology and Patent License Agreements". In connection with the latter contention, Electrode argues that the payments made pursuant to all of its contracts with local industries constitute in large part consideration for intangible rights such as patent technology know-how and continuing, ongoing technological advice and was therefore not taxable under Louisiana sales/use or lease/rental tax provisions. Electrode contends that a small portion of the rental/royalty payments which constitute payments for tangible personal property should be segregated from the payment for technology, and Electrode's liability for taxes should only be based on the proceeds it receives for the use of tangible personal property.
The trial court in its original written reasons concluded that Louisiana law did not permit a breakdown of the anode lease royalty payments into taxable and nontaxable elements. On rehearing, the trial court excluded from tax the technology portion of the lease royalty payment and license fees as to the BASF Wyandotte Corporation and *661 Stauffer, contracts in which there were written breakdowns of the lease royalty payments. Electrode further contends that a license to use a patented process and the technology and know-how related thereto are nontaxable intangible rights in that the ongoing technological assistance rendered by Electrode under the agreements is not one of the services enumerated in La.R.S. 47:301(14).[9] In the trial court's first written reasons for judgment, it was stated:
"The leases do not separate the rental into technological `knowhow' and anode. Despite the testimony of defendant's witnesses to the possibility of segregation of these elements, the court is not pursuaded that the rental price can be broken down for tax purposes. Defendant relies upon Stone v. Stapling Machines Company, [220 Miss. 470] 71 So.2d 205 (Miss. 1954) which involves the contract of lease wherein the parties broke the price into elements which eventually became the basis for the assessment of taxes. This is not the case with these leases, nor is the nature of the lease in Stone similar to the leases here.
The taxing statute at issue is written to cover the lease of tangible personal property. The lease of the anodes is a lease of the tangible personal property. These leases involve a sophisticated piece of equipment and some amount of service is inherent. The statute allows no breakdown in the component parts or nontaxable elements. It is not the function of the court to decree such a breakdown in the face of a statute which allows none."
On rehearing and in the final judgment from which this appeal resulted, the trial court stated:
"Defendant relies on Stone v. Stapling Machines [220 Miss. 470] 71 So.2d 205 (Miss.1954) which involves a lease contract wherein the parties broke the price into elements which eventually became the basis for the assessment of taxes. This procedure is recognized in the State of Louisiana. See Department of Revenue and Taxation Regulation promulgated in connection with La.R.S. 47:301(16) as it relates to computer software. `When the selling price of software is separately set out on a dealer invoice and when such property does not constitute an inseparable part of hardware or other tangible personal property, the software shall not be subject to the sales tax'. In short, if the taxpayer separates the costs, the intangible will not be taxed. If the taxpayer does not separate the costs, it will be taxed.
While not controlling, Stone and the quoted regulation are certainly persuasive. Technology is certainly an intangible. The anode is certainly tangible personal property since both the Stauffer and BSAF Wyandotte leases separate the payments attributable to technology and to hardwarethe anode, the court finds that lease payment attributable to technology and these leases to be nontaxable."
*662 We agree with the original opinion of the trial court. The substance of a contract, not the wording of it, nor the splitting or dividing it up by the contracting parties, is controlling. The taxpayer cannot defeat the Department's collection of taxes by either the wording, form, or label of a contract. Saenger Realty Corporation v. Grosjean, 194 La. 470, 193 So. 710 (1940).
The Saenger case, supra, dealt with a similar issue, and in its opinion, the Supreme Court stated:
"We are not concerned with the wording of the contract or how it is labeled, because this is not a suit between the contracting parties. If the State has a right to tax a subject matter of the contract, it could not be defeated by the label the contract was given or the words used by the contracting parties."
In Saenger, as in the instant case, it is clear that the transfer of technology without the tangible personal property is worthless and therefore the technology (intangible item) is merely incidental to the tangible item and therefore subject to Louisiana sales/use and lease/rental tax. Many tangible items have certain intangible values without which the usage would be either impractical or impossible. The legislature, in enacting a Louisiana sales/use and lease/rental tax has authorized the taxing of intangible rights closely connected to items of tangible personal property. Otherwise, every contract would have to be closely scrutinized to determine what proportion of the money involved should be allocated to tangible personal property and what portion should be allocated to intangible rights.
The Department has promulgated its own regulations in connection with La.R.S. 47:301(16) recognizing an exemption for computer software as an intangible. This exemption is applied prospectively only from the 29th day of December, 1977. However, it is clear that this exemption is limited to computer software and the trial court's extension of this regulation by analogy is clearly erroneous.
An exemption from taxation is a privilege which must be clearly and unequivocally established. Meyers v. Flournoy, 209 La. 812, 25 So.2d 601, 603 (1946); Mattingly v. Vial, 193 La. 1,190 So. 313, 315 (1939); A & P Boat Rentals, Inc. v. Cronvich, 361 So.2d 1260 (La.App. 1st Cir. 1978); Ethyl Corp. v. Collector of Revenue, 351 So.2d 1290 (La.App. 1st Cir. 1977). The split contracts (Technology and Patent License Agreement-Anode Lease Agreement) are in essence the same agreements but spelled out in different contracts and different words. The true object of these contracts, whether labeled "Technology and Patent License Agreement" or "Anode Lease Agreement", were the anodes. Without the anodes, the technology, know-how, etc. would have been of no use to Louisiana industries. The statutes and jurisprudence do not allow the separation of gross proceeds from a lease into nontaxable part attributable to royalty or a part deemed service. A thorough examination of the record does not reveal that substantial services were performed, especially for a particular lease, but merely portrays the availability of Electrode personnel to Electrode's customers for problem solving, technical advice, etc.
The trial judge erred in extending by analogy the 1977 Regulation of the Department concerning an exemption of computer technology. The regulation states:
"When the selling price of software is separately set out on a dealer invoice, and when such property does not constitute an inseparable part of hardware or other intangible personal property, the software shall not be subject to the sales tax."
In the instant case, any know-how or technology is certainly inseparable from the hardware (anodes). The anodes simply cannot be leased without the accompanying technology and know-how and are not even transferred to the lessee until various secrecy and other lease agreements have been signed. The alleged technology or know-how is an inseparable part of the hardware (anode) and for that reason must be included as part of the total price of the lease of *663 anodes. No breakdown between "intangible technology" and "tangible personal property" is allowable in the instant case. Cf. Saenger, supra.

OCCUPATIONAL LICENSE TAX[10]
La.R.S. 47:341, prior to Acts 1981, No. 567, § 1, provided:
"In addition to all of the license and excise taxes imposed in other chapters of this Title, or in other laws, there is hereby levied an annual license tax upon each person pursuing any trade, profession, vocation, calling or business in this State subject to license under Section 8 of Article 10 of the Constitution of 1921, which annual license tax shall be classified and graded as set out in the following sections of this Chapter."
The proposed assessment on Electrode was made on them as a corporation carrying on the business of lease and rentals, or licensing the use of movable property or property rights within the meaning of La. R.S. 47:386.[11] In Collector of Rev. v. Wells Fargo Leasing, 393 So.2d 1244 (La.1981), the Supreme Court extensively reviewed the applicability of the various provisions of the occupational license tax to a situation comparable to the one presented in this case. The Supreme Court stated:
"The language of Section 341each person pursuing any business in the stateis broad in scope. Although taxing statutes must be construed strictly against the taxing authority, Treat v. White, 181 U.S. 264, 267, 21 S.Ct. 611, 613, 45 L.Ed. 853, 854 (1901); Gertrude Gardner Inc. v. McNamara, 359 So.2d 644 (La. App. 1st Cir. 1978), there is no exception from the occupational license tax for persons who carry on business in the state without maintaining a recognized business office. The taxpayer and the court of appeal attached significance to La.R.S. 47:345 which requires `a separate license for each class of business at each place of business.' This statute, it was argued, exempts a person who conducts a business without having a place of business in the state. Of course, most businesses will ordinarily have a recognized office in the state, but the statute does not provide that an office is essential to imposition of the tax. Section 345 merely makes it abundantly clear that a separate license is required for each class of business and allows the state to exact additional revenue from taxpayers who have more than one business location.
That a fixed place of business is not required under La.R.S. 47:341 is supported by express coverage under the occupational license tax of certain transient vendors, the applicable rate of tax being set in La.R.S. 47:381 and 47:385 in language that does not indicate that imposition on these taxpayers is in any way exceptional."
Although Electrode has no established business location or office within the State of Louisiana, it does have agents in the state, thousands of pieces of lease equipment (anodes), and ongoing leases of these anodes with industrial firms in the State of Louisiana. Electrode provides ongoing technical assistance, both in the installation and maintenance of its equipment located in the State, and receives millions of dollars in revenues from its operations in the State. Electrode is clearly "doing business" in this state as defined in La.R.S. 47:301(1) and La.R.S. 47:301(4)(d).
Electrode further contends that the Louisiana occupational license tax as applied to Electrode is discriminatory and violative of federal and state constitutional guarantees of nondiscrimination. Electrode contends that La.R.S. 47:346-395 contains *664 schedules for different types of businesses and there is discrimination between one type of business and the other.
The United States Supreme Court has held that a state may constitutionally levy nondiscriminatory, properly apportioned taxes upon a foreign corporation, when the tax is related to the corporation's local activities and the state is providing benefits and protection for these activities. Mobil Oil Corp. v. Comm. of Taxes of Vermont, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1981); Colonial Pipeline Company v. Traigle, 421 U.S. 100, 95 S.Ct. 1538, 44 L.Ed.2d 1 (1975).
In the Wells Fargo case, supra, the Louisiana Supreme Court expressly rejected the notion that the State of Louisiana's occupational license tax did not apply to foreign corporations having no business office within the state. Because of Electrode's activities within the state, it clearly had the required contacts or nexus with the state to meet the requirements of the due process and commerce clause requirements of the U.S. Constitution. A sufficient nexus exists between the taxpayer and the state when a company takes advantage of the economic milieu within the state to further its corporate goal. The tax is constitutional because the benefits the state provides are substantial and a necessary economic factor in the success of the operations of the taxpayer. The state provides services and protection essential to the marking of the goods, the ownership of the property, and the employment of personnel.
Prior to its repeal in 1981, Louisiana occupational license tax was so drafted as to tax only those persons or firms having the requisite minimum contacts and therefore satisfy the due process requirements of both the Louisiana and U.S. Constitutions and not violate the commerce clause of the U.S. Constitution.
Electrode's contention is that the Louisiana occupational license tax (before repealed) was discriminatory. We do not agree. This tax applied equally to all concerns whether domiciled in the state or domiciled out of the state. Further, any variance in the tax is rationally and reasonably based on the type of business conducted. Electrode cites the case of Mobil Oil Corp. v. Comm. of Taxes of Vermont, supra, in support of its position. A careful reading of this case reveals that it does not support the contention of Electrode. The U.S. Supreme Court in the Mobil case found a sufficient "nexus" between Mobil and the State of Vermont to justify an apportioned tax on both Mobil's investment income and its operating income. The occupational license tax in the instant case is applied to the activity of Electrode with substantial nexus with the State of Louisiana, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State. Cf. Mobil, supra.

PENALTIES AND INTEREST
Electrode contends that the trial court was in error in assessing penalties and interest on the taxes due. Electrode sets forth that its protest was never considered by the Department, no hearing was held and no final assessment was ever issued. Electrode contends that it never had an opportunity to fully present its position or even to pay under protest to avoid the running of interest following the issuance of some formal assessment. Electrode further contends it was denied its statutory right of appeal to the Board of Tax Appeals under R.S. 47:1431 and should not be further penalized by arbitrary penalties and interest. These contentions are without merit.
Electrode has not filed any returns or paid any taxes for the years in question under protest or otherwise. Electrode's position from the beginning was the State of Louisiana had no jurisdiction or authority to tax it in any way and under no circumstances did it owe the state any taxes.
La.R.S. 47:1431 provides that when a taxpayer is aggrieved by an assessment made by the collector, the taxpayer may appeal to the Board for a redetermination of the assessment, etc., by filing a petition with the Board within certain specified delays.
*665 La.R.S. 47:1561 clearly provides that the Department has various discretionary procedures available for tax collection. One of these procedures being suit by ordinary process which was carried out in the instant case. It has long been settled, that it is not necessary for the Department to make a prior assessment by the State for taxes, etc. when the Department is proceeding by summary proceedings or ordinary suit as set out in R.S. 47:1561(2 & 3). See Collector of Revenue v. Frost, 240 La. 1067, 127 So.2d 151 (1961); Collector of Revenue v. Olvey, 238 La. 980, 117 So.2d 563 (1959).
La.R.S. 47:1601 provides in pertinent part as follows:
"When any taxpayer fails to pay any tax, or any portion thereof, due under the provisions of this Subtitle on or before the day when it shall be required by law to be paid, there shall be added to the amount of tax due, interest at the rate of one per centum per month from the due date until paid, ..."
La.R.S. 47:1602 states in pertinent part:
"When any taxpayer fails to make and file any return required to be made under the provisions of this Subtitle at the time such return becomes due, there shall be imposed, in addition to any other penalties provided, a specific penalty to be added to the tax in the amount of five percent of the tax ..."
La.R.S. 47:1512 provides:
"The collector is authorized to employ private counsel to assist in the collection of any taxes, penalties or interest due under this Sub-title, or to represent him in any proceeding under this Sub-title. If any taxes, penalties or interest due under this title are referred to an attorney at law for collection, an additional charge for attorney fees, in the amount of ten per centum (10%) of the taxes, penalties and interest due, shall be paid by the tax debtor."
The statutes and the jurisprudence are clear and unambiguous that both interest and penalties are due and are to be imposed and calculated from the date the taxes were due. La.R.S. 47:1601 and 1602.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is herein amended to provide for judgment in favor of the Department and against the defendant in the sum of $603,357.69 for lease/rental and sales/use taxes due the Department by Electrode for the period January 1, 1971 through December 31, 1974, and further judgment in favor of the Department and against Electrode in the sum of $18,900.00 for occupational license tax for the period January 1,1971 through December 31,1975, together with statutory interest and penalties on said sums as provided by law from date said taxes were due until paid. Appellant Electrode is assessed with all costs of this appeal. The judgment as amended is affirmed.
AMENDED AND AFFIRMED.

APPENDIX I
Codal Articles prior to Acts 1978, No. 728, Codal Articles after Acts 1978, No. 728, § 1.
§1.
Section 2Of Immovables Section 2Immovables
Art. 462 Immovable things are, in general, Art. 462. Tracts of land. Tracts of land,
such as can not either move themselves with their component parts, are immovables.
or be removed from one place to another.
But this definition, strictly speaking, is
applicable only to such things as are
immovable by their own nature, and not to
such as are so only by the disposition of the
law.
Art. 463 There are things immovable by Art. 463. Component parts of tracts of
their nature, others by their destination, land. Buildings, other constructions permanently
*666
and others by the object to which they are attached to the ground, standing
applied. timber, and unharvested crops or ungathered
 fruits of trees, are component parts of
 a tract of land when they belong to the
 owner of the ground.
Art. 464 Lands and buildings or other Art. 464. Buildings and standing timber
constructions, whether they have their as separate immovables. Buildings and
foundations in the soil or not, are standing timber are separate immovables
immovable by their nature. when they belong to a person other than
 the owner of the ground.
Art. 465 Standing crops and the fruits of Art. 465. Things incorporated into an
trees not gathered, and trees before they immovable. Things incorporated into a
are cut down, are likewise immovable, and tract of land, a building, or other
are considered as part of the land to which construction, so as to become an integral
they are attached. part of it, such as building materials, are its
 component parts.
As soon as the crop is cut, and the fruits
gathered, or the trees cut down, although
not yet carried off, they are movables.
If a part only of the crop be cut down,
that part only is movable.
Art. 466 The fruits of an immovable, Art. 466. Component parts of buildings or
gathered or produced while it is under other constructions. Things permanently
seizure, are considered as making part attached to a building or other construction,
thereof, and inure to the benefit of the such as plumbing, heating, cooling,
person making the seizure. electrical or other installations, are its
 component parts.
 Things are considered permanently attached
 if they cannot be removed without
 substantial damage to themselves or to the
 immovable to which they are attached.
Art. 467 Wire screens, water pipes, gas Art. 467. Immovables by declaration.
pipes, sewerage pipes, heating pipes, The owner of an immovable may declare
radiators, electric wires, electric and gas that machinery, appliances, and equipment
lighting fixtures, bathtubs, lavatories, closets, owned by him and placed on the immovable,
sinks, gasplants, meters and electric other than his private residence, for
light plants, heating plants and furnaces, its service and improvement are deemed to
when actually connected with or attached be its component parts. The declaration
to the building by the owner for the use or shall be filed for registry in the conveyance
convenience of the building are immovable records of the parish in which the
by their nature. immovable is located.
Art. 468 Things which the owner of a Art. 468. Deimmobilization. Component
tract of land * has placed upon it for its parts of an immovable so damaged or
service and improvement * are immovable deteriorated that they can no longer serve
by destination. the use of lands or buildings are deimmobilized.
Thus the following things are immovable The owner may deimmobilize the component
by destination when they have been placed parts of an immovable by an act
by the owner for the service and translative of ownership and delivery to
improvement * of a tract of land, * to wit: acquirers in good faith.
 In the absence of rights of third persons,
Cattle intended for cultivation. the owner may deimmobilize things by
 detachment or removal.
Implements of husbandry.
Seeds, plants, fodder and manure.
Pigeons in a pigeon house.
Beehives.
*667
Mills, kettles, alembics, vats, and other
machinery made use of in carrying on the
plantation works.
The utensils necessary for working
cotton, and sawmills,** tafia distilleries,
sugar refineries and other manufactures.
All such movables as the owner has
attached permanently to the tenement or
to the building, are likewise immovable by
destination.
Art. 469 The owner is supposed to have Art. 469. Transfer or encumbrance of
attached to his tenement or building immovable. The transfer or encumbrance
forever such movables as are affixed to the of an immovable includes its component
same with plaster, or mortar, or such as can parts.
not be taken off without being broken or
injured, or without breaking or injuring the
part of the building * to which they are
attached.
Art. 470* Incorporeal things, consisting Art. 470. Incorporeal immovables. Rights
only in a right, are not of themselves and actions that apply to immovable
strictly susceptible of the quality of things are incorporeal immovables. Immovables
movables or immovables; nevertheless they of this kind are such as personal
are placed in one or the other of these servitudes established on immovables, predial
classes, according to the object to which servitudes, mineral rights, and petitory
they apply and the rules hereinafter or possessory actions.
established.
Art. 471 The following are considered as Acts 1978, No. 728, § 1, removed Art. 471
immovable from the object to which they from Section 2Immovables to Section
apply: 3Movables and reads as follows:
The usufruct and use of immovable Art. 471. Corporeal movables. Corporeal
things. movables are things, whether animate or
 inanimate, that normally move or can be
A servitude established on an immovable moved from one place to another.
estate.
An action for the recovery of an
immovable estate or an entire succession.
NOTES
[1] The Department field suit for lease/rental and sales/use taxes for the period "January 1, 1971 through December 31, 1975. "The Department has not urged this discrepancy on appeal by briefs or otherwise; therefore, any claim for January 1, 1975 through December 31, 1975 for lease/rental and sales/use taxes is considered abandoned.
[2] It appears that the earliest contract was entered into between PERMELEC USA, Inc. (the name was subsequently changed to Electrode Corporation) and PPG Industries, Inc. on January 16, 1969.
[3] Each lease contract contained the following or similar language:

"All PPG DSA (abbreviation for dimensionally stable anodes) are at all times agreed to be and to remain the personal property of lessor."
Additionally, each contract provided that upon termination of the anode lease agreement that the lessee would forthwith cease to use the anodes and at its own cost and expense, after inspection by Electrode, would deliver the anodes to Electrode in the condition in which they were received from Electrode, less normal wear and tear, at such place within the United States of America as Electrode would designate.
[4] The civil law terms "immovable by nature" and "immovable by destination" have now been effectively abolished in Louisiana law. See Appendix I.
[5] Benoit v. Acadia Fuel and Oil Distributors, Inc., 315 So.2d 842 (La.App. 3rd Cir. 1975).
[6] Cf. Footnote 1 and Appendix I.
[7] Underlining by the court.
[8] Ibid.
[9] (14) "Sales of services" means and includes the following:

(a) the furnishing of rooms by hotels, and tourist camps;
(b) the sale of admissions to places of amusement, to athletic entertainment other than that of schools, colleges and universities, and recreational events, and the furnishing, for dues, fees, or other consideration, of the privilege of access to clubs or the privilege of having access to or the use of amusement, entertainment, athletic or recreational facilities;
(c) the furnishing of store or parking privileges by auto hotels and parking lots;
(d) the furnishing of printing or overprinting, lithographic, multilith, blue printing, photostating or other similar services of reproducing written or graphic matter;
(e) the furnishing of laundry, cleaning, pressing and dyeing services, including by way of extension, and not of limitation, the cleaning and renovation of clothing, furs, furniture, carpets and rugs, and the furnishing of storage space for clothing, furs and rugs.
(f) the furnishing of cold storage space and the furnishing of the service of preparing tangible personal property for cold storage, where such service is incidental to the operation of storage facilities; and
(g) the furnishing of repairs to tangible personal property, including by way of illustration and not of limitation, the repair and servicing of automobiles and other vehicles, electrical and mechanical appliances and equipment, watches, jewelry, refrigerators, radios, shoes, and office appliances and equipment.
[10] The State occupational license tax was effectively repealed by Acts, 1981, No. 567, § 1 effective January 1, 1982.
[11] La.R.S. 47:386 provides in part as follows:

"Every person carrying on the business of leasing, renting or licensing the use of movable property or other property rights, whether the business shall be conducted as principal agent on commission or otherwise shall pay license tax based on the gross annual receipts. The amount of this license shall be as shown in the following table:..."