**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 95-31057.

BAYOU FLEET PARTNERSHIP, Plaintiff-Appellant/Cross-Appellee,

v.

DRAVO BASIC MATERIALS COMPANY INCORPORATED, Defendant-Appellee/Cross-Appellant,

Dravo Corporation, Defendant-Appellee/Cross-Appellant.

DRAVO BASIC MATERIALS COMPANY, INC., Plaintiff-Appellee/Cross-Appellant,

v.

BAYOU FLEET, INCORPORATED, Defendant,

and/or

Bayou Fleet Partnership, Defendant-Appellant/Cross-Appellee.

March 5, 1997.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before POLITZ, Chief Judge, and EMILIO M. GARZA and STEWART, Circuit Judges.

POLITZ, Chief Judge:

Bayou Fleet Partnership, plaintiff, and Dravo Basic Materials Company, Inc. and Dravo Corporation, defendants, both appeal a judgment against Dravo Basic for $25,000 in damages caused by Dravo's unauthorized removal of limestone working bases from Bayou Fleet's property. We conclude that under controlling provisions of the Louisiana Civil Code the limestone working bases were a component part of the immovable property belonging to Bayou Fleet.

1

For the reasons assigned, we reverse and render judgment in favor of Bayou Fleet.

## Background

From 1989 to 1993, pursuant to an oral lease, Dravo operated an aggregate yard in Hahnville, Louisiana on a tract of Mississippi River batture property owned by Neal Clulee. Dravo established the aggregate yard to store, stockpile, and sell limestone extracted from quarries in Illinois and Kentucky and transported down the Mississippi River to the yard.

Dravo established three stockpiles of limestone on the Clulee property, each of which was placed on a foundation made from hardened limestone commonly called a "working base." The working bases were formed by putting a fabric liner on the batture and placing large quantities of loose, saleable, limestone thereon until the weight compressed the batture and the limestone became compacted. Once formed, tons of loose limestone could be stored on the working bases.

On August 13, 1992, the Sheriff of St. Charles Parish seized the Clulee property and on January 27, 1993 sold it at a sheriff's sale. Bayou Fleet[1] acquired ownership and intended to continue to lease to Dravo or some other aggregate yard operator. Bayou Fleet and Dravo could not reach a lease agreement and Dravo determined to vacate the premises but did not do so until the weekend of March 6-

---

[1]Louisiana Materials Co., Inc. actually purchased the property at the sheriff's sale, but under a prior agreement with Bayou Fleet it promptly transferred the property.

8, 1993.[2]

On March 6, 1993 Dravo began to remove the limestone from the property, utilizing a Cat 225 Excavator, a backhoe, a bulldozer, front end loaders, and dump trucks. Over the weekend Dravo removed all of the loose stockpiles of limestone as well as the three working bases. In all, Dravo removed approximately 26,000 tons of limestone.[3] On March 9, 1993 Bayou Fleet learned that Dravo had removed the stockpiles and the working bases.[4]

Dravo filed a declaratory judgment action in state court seeking to be declared the owner of the limestone removed from the property. Bayou Fleet then filed this action for damages and removed Dravo's state court action to federal court. The two actions were consolidated and tried to the bench. The district court found that Dravo was entitled to remove a majority of the limestone in the working bases. Dravo was held liable, however, for the excavation of the portion of the working bases that had

---

[2]The parties dispute whether Dravo had Bayou Fleet's permission to remain on the property from the time of the sheriff's sale until the weekend of March 6, 1993. Robin Durant, a partner of Bayou Fleet, contacted Richard Koen, an employee of a company controlled by Dravo, during the last week of February 1993 to ask why Dravo had not vacated the property. In addition, Durant sent the president of Dravo two separate faxes, dated March 2, 1993 and March 8, 1993, requesting confirmation that all of Dravo's materials had been removed. The faxes went unanswered.

[3]There is no evidence in the record how many tons of limestone removed by Dravo constituted loose, saleable limestone from the stockpiles and how many tons constituted hardened, compacted limestone from the working bases.

[4]Fritz John Miller, Jr., an employee of Bayou Fleet, discovered the damage on March 9, 1993 and reported it to Bayou Fleet, describing the property as "look[ing] like a bomb had been dropped [on it]."

become a component part of the property. The court stated that Dravo's surreptitious removal of the limestone was "unusual and unbusinesslike," and it held Dravo liable for $25,000 in damages caused by its trespass on Bayou Fleet's property. Both Bayou Fleet and Dravo timely appealed.

*Analysis*

The sole issue presented by this appeal is whether Dravo had the right to remove the limestone working bases and the loose stockpiles of limestone from Bayou Fleet's property. The resolution of this issue turns on the classification of the limestone as either movable or immovable under Louisiana property law. Findings of fact are upheld unless clearly erroneous.[5] The classification of the limestone is a matter of law which we review *de novo.*[6]

The Civil Code classifies things as either movable or immovable.[7] An immovable is defined as a tract of land with its component parts.[8] Article 463 of the Civil Code provides that component parts of a tract of land include, among other things, other constructions that are permanently attached to the ground. The Civil Code does not, however, specifically define what qualifies as an "other construction" under Article 463; that

---

[5]*James v. Hyatt Corp.,* 981 F.2d 810 (5th Cir.1993).

[6]*Equibank v. United States Internal Revenue Service,* 749 F.2d 1176 (5th Cir.1985).

[7]La. Civ.Code art. 448.

[8]La. Civ.Code art. 462.

determination is left to the judiciary giving due consideration to prevailing societal notions.[9]  Louisiana courts have found "other constructions" to include a cistern, corn mill, gas tank, barbed wire fence, outdoor advertising sign, and a railroad track.[10]  We now conclude that the limestone working bases at issue herein can and properly should be classified under Article 463 as other constructions permanently attached to the ground.

In determining whether an object is an "other construction" within the meaning of Article 463, Louisiana courts generally rely on three criteria:  the size of the structure, the degree of its integration or attachment to the soil, and its permanency.[11]  If there is a failure of any of these criteria, an object will not be deemed to be an immovable.[12]

---

[9]*Bailey v. Kruithoff,* 280 So.2d 262 (La.App.1973);  *Benoit v. Acadia Fuel & Oil Distributors, Inc.,* 315 So.2d 842 (La.App.), *writ refused,* 320 So.2d 550 (1975).

[10]See *Polhman v. De Bouchel,* 32 La. Ann. 1158 (1880);  *Bigler v. Brashear,* 11 Rob. 484 (1845);  *Monroe Auto & Supply Co. v. Cole,* 6 La.App. 337 (La.App.1927);  *Bailey;  Industrial Outdoor Displays v. Reuter,* 162 So.2d 160 (La.App.), *writ refused,* 164 So.2d 352 (1964);  *American Creosote Co. v. Springer,* 241 So.2d 510 (1970).

[11]*Bailey;  Benoit;  Telerent Leasing Corp. v. R & P Motels, Inc.,* 343 So.2d 267 (La.App.1977).  Although these cases were decided prior to the 1978 revision of the Louisiana Civil Code, they remain relevant to the determination of what qualifies as an other construction under Article 463, a matter not addressed by the revision.  A.N. Yiannopoulous, Property, Louisiana Civil Law Treatise, § 141, p. 311 (1991).

[12]See, e.g., *McNamara v. Electrode Corp.,* 418 So.2d 652 (La.App.), *writ denied,* 420 So.2d 986 (1982) (holding that anodes that were small in size and could be removed in 15 minutes were movable because they lacked the required size and degree of permanency);  Telerent Leasing Corp. (holding that an alarm system, a public address system, and a background music system which were

The limestone working bases were massive in size. The volume of the limestone excavated by Dravo was 26,628.98 cubic yards and approximately 46,721.5 cubic yards of dirt would be required for fill to restore the land to its prior condition. The working bases were capable of supporting the weight of tons of loose limestone, dump trucks, tractor-trailers, and other heavy equipment used in the operation of the aggregate yard.

The limestone working bases were attached firmly to the property. The weight of the limestone working bases compressed the batture property and, having done so, actually formed the surface level of the property. To remove the working bases Dravo had to dig them out of the ground, using heavy equipment, including a Cat 225 Excavator, to break loose the compacted limestone.

Finally, the limestone working bases achieved the necessary degree of permanency, having been placed on the Clulee property in 1989 and continuing thereon undisturbed until Dravo's action. In its regular course of business Dravo did not remove any of the limestone from the working bases; only loose limestone from the stockpiles on top of the working bases was sold to customers.

We conclude that the size, degree of attachment, and permanence of the limestone working bases, all combine to establish beyond peradventure that the limestone working bases of the aggregate yard were other constructions permanently attached to the ground within the intendment of Article 463. The loose stockpiles

---

easily removed were all movable because they lacked the necessary degree of permanency).

of limestone were not;  nor do they qualify as an immovable under any other applicable provision of the Civil Code. Although the stockpiles were massive in size, they were neither attached to the ground nor permanent.

The classification of the working bases as other constructions does not, however, end our inquiry.  The ownership of the working bases must be determined by reference to Civil Code articles concerning accession in relation to immovables.[13]  Other constructions, such as the limestone working bases, may belong to a person other than the owner of the ground to which they are attached.  They are presumed, however, to belong to the owner of the ground unless separate ownership is evidenced properly by a recorded document.  Absent such a public recordation, an other construction is considered to be a component part of the land and is transferred with it.[14]

Dravo was the original owner of the materials composing the working bases, but it recorded no evidence of its ownership.  It could have protected its interest in the limestone working bases by recording its lease with Clulee.[15]  This was not done and Bayou Fleet acquired the immovable property free and clear of any claim Dravo may have had to the land or any constructions thereon.[16]

Ownership of the working bases transferred to the purchaser at

---

[13]La. Civ.Code arts. 490–506.

[14]*See* La. Civ.Code art 491;  Yiannopoulos, § 141, p. 312.

[15]American Creosote.

[16]La. Civ.Code art. 498.

the sheriff's sale.[17]  Dravo had no right to remove the working bases and is thus liable for their reasonable replacement cost.[18] Uncontroverted expert testimony in the record establishes that it would cost $263,222.22 to restore the property to its former condition.  We therefore REVERSE the judgment of the district court and RENDER judgment in favor of Bayou Fleet and against Dravo Basic Materials Company, Inc. and Dravo Corporation in that amount.  We defer to the district court on the matter of interest and return this matter for entry of an appropriate judgment.

Appellant-cross-appellee's motion to strike cross appellants' reply brief is DENIED. Appellee-cross-appellant's motion to file supplemental briefs is DENIED.

---

[17]See n. 1;  *Central Oil & Supply Corp. v. Wilson Oil Co.*, 511 So.2d 19 (La.App.1987), *writ denied,* 535 So.2d 747 (1989) (holding that a purchaser at a sheriff's sale became the owner of equipment that had become incorporated into immovable property).

[18]*Bailey* (holding that lessee who removed a fence which had become a component part of the land was liable to purchaser of land for the reasonable replacement cost of the fence).